# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

Adil Khalil,

**-against-**

City of New York, New York Police Department
Officer 'John Doe 1-4', Department of Citywide
Administrative Services Officer 'John Doe' 1-4,
Paramedic EMT Technicians 'John Doe' 1-6

**Second Amended Complaint (SAC)
for Violation of Civil Rights**
(Non-Prisoner Complaint)

Case No.

**2:17-CV-01729 (JFB)(SIL)**

Jury Trial:     X Yes     ☐ No
*(check one)*

★FILED★
2018 SEP 10 PM 6:37
U.S.DISTRICT COURT
E.D.N.Y.

## NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting
from public access to electronic court files.  Under this rule, papers filed with the court should
*not* contain: an individual's full social security number or full birth date; the full name of a
person known to be a minor; or a complete financial account number.  A filing may include
*only*: the last four digits of a social security number; the year of an individual's birth; a
minor's initials; and the last four digits of a financial account number.

Plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other
materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an
application to proceed in *forma pauperis.*

RECEIVED
SEP 1 1 2018
EDNY PRO SE OFFICE

## I.   The Parties to This Complaint

### A.   The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach
additional pages if needed.

|  |  |
|---|---|
| Name | **Adil Khalil** |
| Street Address | **158 Broadway** |
| State and Zip Code | **Shirley, N.Y. 11967** |
| Telephone Number | **(516) 652-4626** |

### B.   The Defendant(s)

Provide the information below for each defendant named in the complaint,
whether the defendant is an individual, a government agency, an organization, or
a corporation.  For an individual defendant, include the person's job or title (if
known) and check whether you are bringing this complaint against them in their
individual capacity or official capacity, or both.  Attach additional pages if
needed.

Defendant No.1

|  |  |
|---|---|
| Name | **The City of New York** |
| Job or Title | **Mayor of New York City** |
| Street Address | **City Hall** |
| State and Zip Code | **New York, NY 10007** |

Defendant No. 2-5

|  |  |
|---|---|
| Name | **'John Doe'** |
| Job or Title | **New York Police Department Officer/Lieutenant** |
| Street Address | **1 Police Plaza, Room 1406** |
| State and Zip Code | **New York, NY 10038** |

Defendant No. 6-9

| | |
|---|---|
| Name | **'John Doe'** |
| Job or Title | **NYC Department of Citywide Administrative Services Officer** |
| Street Address | **1 Centre Street, 17th Floor South** |
| State and Zip Code | **New York, NY 10007** |

Defendant No. 10-15

| | |
|---|---|
| Name | **'John Doe'** |
| Job or Title | **Paramedic Emergency Medical Technicians** |
| Street Address | **9 Metro Tech Center** |
| State and Zip Code | **Brooklyn, NY 11201** |

## II.  Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]."  Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A.  Are you bringing suit against *(check all that apply)*:

X   **State or local officials (§ 1983 and § 1985 claim)**

☐   Federal officials (a *Bivens* claim)

B.  Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983.  If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

**First, Fourth, and Fourteenth Amendment**

C.  Section 1985- conspiracy to violate civil rights

**First, Fourth, and Fourteenth Amendment**

3

D.   Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law.

**NYPD, DCDA and EMT Defendant officers were acting in their official capacity when they arrested, beat, and detained me on 02/07/14 and 12/26/15. NYPD , IAB, CCRB and DCAS officers violated my rights and retaliate against me for making complaints in violation of the Civil Rights Act of 1964. Agents of the city, while in their official capacity, discriminated me and violated my rights under The Constitution of the United States, New York State Constriction, NYS criminal penal code.**

## III.   Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.   Where did the events giving rise to your claim(s) occur?

**87-27 169th Street Jamaica, NY**

B.   What date and approximate time did the events giving rise to your claim(s) occur?

**February 07, 2014 and December 26, 2015**

C.   What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

***See complaint**

**Statement of the case**

[1] Pursuant to 42 U.S. Code § 1983 pro se plaintiff is bringing an action at law, suit in equity, or other proper proceeding for redress. Defendants are in violation of statues and laws under the Constitution of the United States, New York State Constriction, and New York State criminal penal code.

[2] This court has jurisdiction under 42 U.S. Code § 1983.

[3] The first amendment to the United States Constitution states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

[4] The fourth amendment to the United States Constitution states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[5] The 14th amendment to the United States constitution states "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[6] Article I, Section 8 of the New York State Constitution provide for the protection of free speech. Article I, Section 3 of the New York State Constitution provide for the protection of free speech, freedom of worship and religious liberty. Article I, Section 11 of the New York State Constitution provide for the equal protection of laws and the discrimination in civil rights prohibited. Article I, Section 12 of the New York State Constitution provide for the protection of right to security against unreasonable searches, seizures and interceptions.

[7] The City of New York denied the complainant due process and equal protection of the 14th amendment when the New York City Police Department performed an unlawful seizure violating plaintiff's fourth amendment protected constructional right. ¶14, ¶16, ¶17, ¶25, ¶37, ¶39, ¶44 Article I, Section 11 of the New York State Constitution provide for the equal protection of laws

5

and the discrimination in civil rights prohibited.  Article I, Section 12 of the New York State Constitution provide for the protection of right to security against unreasonable searches, seizures and interceptions.  The City of New York is in violation of selective enforcement procedures protected under the 14th amendment to the Constitution of the United States equal protection clause. ¶40   The City failed to provide police protection under the special relationship exception with requisite intent of ill will.  The municipality did not follow procedural due process clause NYSMHL§9.41 and §9.42 and §9.46 to equally protect the complainant under the 14th amendment without being administered in a prejudicial manner.

[8] Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia

[9] When analyzing whether defendants where in violation of depravation of rights we must first give explanation for four offenses. (1) The victim was an inhabitant of a U.S. state, district, or territory when the alleged violation occurred. (2) named defendants acted under color of state law NYSMHL§9.41 when they abused their authority under New York Consolidated Laws, Criminal Procedure Law - CPL§1.20 peace officers and New York Consolidated Laws, NYCPL§2.10 person designated as peace officers, New York City Administrative Code AC§14-110 warrant of appointment; oath, AC§14-117 assignment to police duty and AC§14-119 department to cooperate with department of health as well as the law of The Rules for the City of New York Title 24 Department of Health and Mental Hygiene and Title 55 Department of Citywide Administrative Services.  *Screws v. United States, 325 U.S. 91,111 (1945) (stating that "[a]cts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it."* (3) The defendant's conduct deprived the victim of the first, fourth and 14th amendment rights secured or protected by the Constitution of the United States, including the right not to be deprived freedom from unreasonable searches and seizures. *See, United States v. Langer, 958 F.2d 522 (2nd Cir. 1992).* and (4) the defendant acted willfully, that is, with specific discriminatory malicious intent to violate the protected constitutional right when they falsely arrested and abused color of NYSMHL§9.41 and granted under the New York Consolidated Laws, Criminal Procedure Law - CPL§1.20 peace officers and New York Consolidated Laws, NYCPL§2.10 person designated as peace officers, New York

City Administrative Code AC§14-110 warrant of appointment; oath, AC§14-117 assignment to police duty and AC§14-119 department to cooperate with department of health as well as the law of The Rules for the City of New York Title 24 Department of Health and Mental Hygiene and Title 55 Department of Citywide Administrative Services. *Screws v. U.S. 325 U.S. 91 (1945); United States v. Guest, 383 U.S. 745 (1986) and United States v. Price, 383 U.S. 787 (1966). United States v. Shafer, 384 F. Supp. 496 (N.D. Ohio 1974. United States v. Ramsey, 336 F.2d 512 (4th Cir. 1964) Apodaca v. United States, 188 F.2d 932 (10th Cir. 1951).*

[10] "42U.S.C.§1983 itself does not create substantive rights, it does provide "a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James, 13d 515, 519 (2nd Cir. 1993)*. A claim arising under 42U.S.C.§1983 most demonstrate (1) plaintiff was denied the rights granted under the first, fourth, and 14th amendments to the Constitution of the United States (2)  New York City Police Department Officer 'John Doe 1-4', NYC Department of Citywide Administrative Services Officer 'John Doe' 1-4, NYC Paramedic EMT Technicians 'John Doe' 1-6 acting under color of NYSMTL§9.41 ¶16, ¶25 and authorized under New York Consolidated Laws, Criminal Procedure Law - CPL§1.20 peace officers and New York Consolidated Laws, NYCPL§2.10 person designated as peace officers, New York City Administrative Code AC§14-110 warrant of appointment; oath, AC§14-117 assignment to police duty and AC§14-119 department to cooperate with department of health as well as the law of The Rules for the City of New York Title 24 Department of Health and Mental Hygiene and Title 55 Department of Citywide Administrative Services. The definition of acting under color of state law requires that the defendant exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classics 313 U.S. 299, 326, 61 S. Ct. 1031, 1043 (1941).*

[11] The plaintiff was denied his substantial due process rights of life and liberty due to the action of the city employees.  The plaintiff developed life disabling illness, mainly glaucoma ¶34, and was denied the liberty in choosing to practice the religion of his choice. ¶34, ¶36

[12] Liberties are the freedom in choosing, saying, publishing or petitioning granted under the Constitution of the United States.  The defendant has denied the plaintiff the freedom of religion. The civil right of choosing a religion, whether that be atheist, agnostic, pagan or any of the three (3) major monotheistic religions.  The municipality has profiled and discriminated the plaintiff due to a mental disability, religion and race of a brown male Pakistani Moslem/Muslim. ¶21, ¶22, ¶41

## Statement of the Facts

[13]   While at the New York Institute of Technology, plaintiff was said to be emotionally disturbed and was required to bring a letter from a licensed psychiatrist/psychologist every two

weeks indicating that the plaintiff can function on college campus and that he was not a danger
to himself or others. ¶1  Plaintiff was subjected to a psychiatric evaluation by the New York
Institute of Technology which states that the plaintiff suffers from an adjustment disorder,
personality disorder and educational problems. ¶2  From the Pratt Institute website campus
directry ¶3 indicates that Professor Nicolas Agneta is employed at both the New York Institute of
Technology and the Pratt Institute.  During the Fall 2010 semester plaintiff takes part in a course
at the Pratt Institute having student's research weapons of war, plaintiffs assignment is the city of
Afghanistan and the suicide bomber. ¶4, ¶5  Plaintiff is diagnosed with ocular inflammation on
11/03/10 with visual acuity in the right eye 20/200 legally blind in the United States.  ¶6
Plaintiff submits his degree project proposal to the Pratt Institute School of Architecture. ¶7  On
12/21/10 Pratt Institute Vice President notifies the plaintiff that the Institute is involuntarily
withdrawing him from the architecture degree program due to mental illness. ¶8, ¶9 Plaintiff
takes a protective action when reporting discrimination to the United States Department of
Education office for civil rights.  ¶10  Vice President notifies the associate registrar that there is
reason to fear the plaintiff due to mental illness. ¶11  Ophthmologist notifies the plaintiff that it
is advised to take chemotherapy for the ocular inflammation. ¶12  NYPD or the alleged bipolar
female stalker begin to make postings online possibly impersonating a police officer in violation
of NYS 190.26.  ¶13  On 02/07/14 NYPD unlawfully seize the plaintiff under NYSMHL9.41.
¶14, ¶16, ¶17  Plaintiff is witness by FDNY EMT technicians as bleeding as a result of excessive
force by NYPD John Doe 1 and John 2.  ¶17  Plaintiff begins receiving life threatening stalking
and harassment by the NYPD after making a complaint to the Internal Affairs Bureau. ¶15  On
04/08/14 plaintiff requests freedom of information request for records pertaining to the 02/07/14
false arrest, although the NYPD states that the plaintiff is delusional and suffering from mental
illness, these events had not occurred.  ¶18, ¶24  On or about November 7, 2013 Steve Byrnes
from the Melville FBI field office, contact phone number (646) 210-9518, in regards to several
email complaints sent to secretary of Education Arne Duncan and complaints against U.S.
Department of Education's investigation into discrimination, internet harassment by the FBI and
Natalie Becerra similar to what the plaintiff encountered at school, documented on forensic
psychiatric evaluations as beginning on November 7, 2001. ¶2, ¶20  On November 17, 2014 the
FBI contacts the plaintiff acknowledging "NYPD misconduct and meeting with an FBI agent on
11/7/2013 for making complaints to the attorney general for Education… and access to internet
dating websites have been blocked." ¶20  On 11/20/14 DCDA officers at the NYC buildings
department falsify reports that the plaintiff engaged in terroristic threats against the occupants at
210 Joreloman Street in Brooklyn in violation of NYS§240.50, §240.55 and §240.60.  ¶21,¶22
Plaintiff begins having problems with the administering of chemotherapy as noted by the
opthamologist in a letter dated 11/28/14. ¶23  On 12/26/15 NYPD unlawfully seize the plaintiff
under NYS MHL 9.41.  ¶25 On 09/01/16 plaintiff undergoes biopsy of the spleen, which tests
positive for sarcodosisis. ¶26  On 11/18/16 Mount Sinai Cancer Center notify the plaintiff that he
has tested positive for the autoimmune disease sarcodosis. ¶27  On March 2, 2017 Pratt Institute
School of Information notified students via electronic Facebook that the FBI was conducted a

meet and greet on college campus, "in an effort to build better relationships with the community." ¶28 On 03/22/17 plaintiff filed a protective action with the E.D.N.Y. district courthouse. ¶45 On 04/18/17 plaintiff notifies former attorney James LeBow as well as the U.S. Department of Education and the U.S. Air Force that he is initiating legal action. ¶29, ¶30 Plaintiff mailed Standard Form 95 (SF-95) claims against the federal government for negligence, requesting that the government cease and desist the federal employee female stalker from contacting him or causing anymore health issues for the plaintiff immediately and/or in the future and that the plaintiff remain free of student loan repayment harassment. ¶30 On 08/01/17 plaintiff filed an amended complaint with the E.D.N.Y. district courthouse. ¶45 Plaintiff receives correspondence from the U.S. Department of Education in regards to a possible cause of action under the Tucker Act. ¶31 The State Bar of Texas opens an investigation against former attorney James LeBow for professional misconduct on 09/11/17. ¶32 On 11/20/17 defendants file motion to dismiss with the E.D.N.Y. district courthouse. ¶45 On 12/18/17 defendants file motion to dismiss with the E.D.N.Y. district courthouse. ¶45Plaintiff is diagnosed with secondary uvetic glaucoma on 01/19/18 ¶34 as a result of having problems with administration of medication. On 01/19/18 plaintiff files rebuttal to the defendants motion to dismiss with the E.D.N.Y. district courthouse. ¶45¶34 The State Bar of Texas concludes its investigation into professional misconduct against former attorney James Lebow on 01/23/18. On 02/14/18 defendants file motion to dismiss with the E.D.N.Y. district courthouse. ¶45 Plaintiff under goes glaucoma surgery on 02/26/18 at Fromer Eye Centers. ¶36 On April 13, 2018 the NYC Department of Buildings falsely arrested the plaintiffs business and place of employment and assessed him at $3,750 fine, targeting his protected class as a "Pakistani" and on the probable cause that there was prostitution and adult services being offered at 169-20 Hillside Avenue in the borough of Queens. ¶41 Plaintiff is falsely arrested by The City of New York under NYSMHL9.41 on 05/03/18. ¶37 Plaintiff undergoes lithotripsy surgery at the Long Island Jewish Forest Hills Hospital. ¶38 Plaintiff is falsely arrested by The City of New York under NYSMHL9.41 on 05/25/18, the hospital opted out of tranquilizers and rather forcefully administered, without plaintiffs consent antipsychotic medication injections in an outpatient setting against the printed instructions of safe use of medication haladol, putting plaintiff at risk of death, cardiac arrest and renal failure. ¶2, ¶39 Plaintiff has no history of psychiatric hospitalizations or medications, the City of New York acted in malicious intent of requisite ill will when in violation of NYS penal code 120.11 attempted murder, and with the malicious intent of requisite ill will to cause plaintiff mental illness. ¶2 Queens District Attorney's office charges the plaintiff with criminal charges on 06-01-18 for his choice in refusing to testify and/or remember a bus accident dating back to 2015. Queens District Attorney Richard Brown and his subordinates are in violation of NYS penal code 215.16 intimidating a witness or a victim in the second degree. On 06/11/18 Magistrate Judge from E.D.N.Y. district courthouse issues a report and recommendation. ¶45 Plaintiff's employee issues a letter to the court dated 07-17-18 indicating that the plaintiff is having problems at his job, and responsibilities as a junior architect. ¶43 On 07/26/18 E.D.N.Y. district courthouse adopts the report and recommendation.

¶45 On 08/18/18 NYPD unlawfully seize the plaintiff under NYS MHL 9.41. ¶44

## Timeliness

**[14]** Plaintiff is a qualified individual under NYS CPLR 208. Plaintiff has been temporary disabled since 11/03/10 ¶3. The injury sustained by the plaintiff was known on January 13, 2018 as secondary uvetic glaucoma ¶34. Due to a temporary mental incapacity to protect one's rights, plaintiff could not, because of personal injury and unlawful arbitrary government harassment infringing on his constitutional rights.

**[15]** CPLR 208 extends the statute of limitation if a person entitled to bring an action is insane when it accrues. The first definition of insanity under CPLR 208 was recently presented in *Hurd v County of Allegany*, the Appellate Division, Fourth Department, construing the terms to include "a temporary mental incapacity to protect one's rights resulting from personal injury.

**[16]** On September 1, 2016 the plaintiff is confirmed to have the auto immune disease sarcodoisis on a surgical pathology reportwith addendum. ¶26 On November 18, 2016 Mount Sinai School of Medicine Division of Pulmonary confirmed and notified the plaintiff of diagnoses for the autoimmune disease Sarcoidosis. ¶27

**[17]** Sarcoidosis is a systemic and inflammatory disease of unknown aetiology, which commonly affects the lungs, the skin, the lymph nodes, the liver, and the nervous system. This disorder can be chronic, progressive, and self-limiting. The aetiopathogenesis, stressful life events like getting married, starting a job, and changes in responsibilities at work have been shown to significantly influence the onset and the worsening of the disease. Among patients with sarcoidosis, a high incidence of alexithymic personality traits has also been evidenced.

**[18]** The more severe forms may have profound effects on the quality of life of the patients, and a high prevalence of depressive symptoms was found in affected patients. It has been suggested that clinicians should consider a psychological intervention with or without antidepressants according to whether significant depressive symptoms are identified.

**[19]** Schizotypal personality disorder is characterized by someone who has great difficulty in establishing and maintaining close relationships with others. A person with schizotypal personality disorder may have extreme discomfort with such relationships, and therefore have less of a capacity for them. Someone with this disorder usually has cognitive or perceptual distortions as well as eccentricities in their everyday behavior. ¶2

**[20]** Individuals with schizotypal personality disorder often have ideas of reference (e.g., they have incorrect interpretations of casual incidents and external events as having a particular and unusual meaning specifically for the person). People with this disorder may be unusually superstitious or preoccupied with paranormal phenomena that are outside the norms of their subculture. ¶2

**[21]** Those with this disorder often seek treatment for the associated symptoms of anxiety, depression, or other dysphoric effects rather than for the personality disorder features per se. A

personality disorder is an enduring pattern of inner experience and behavior that deviates from the norm of the individual's culture.  The pattern is seen in two or more of the following areas: cognition; affect; interpersonal functioning; or impulse control. The enduring pattern is inflexible and pervasive across a broad range of personal and social situations. It typically leads to significant distress or impairment in social, work, or other areas of functioning. The pattern is stable and of long duration, and its onset can be traced back to early adulthood or adolescence.

[22] Plaintiff suffers from Sarcoidosis the mental illness, associated with a serious of post traumatic or adjustment disorders with skitzotypical personality traits and educational problems related to the social environment.  Plaintiff is currently encountering an adjustment disorder, encountering problems with all levels of law enforcement. ¶20, ¶33   Plaintiff's adjustment disorders can be traced back to 11/07/01 ¶2 and problems encountered by the plaintiff during his college education.   Since 02/07/14 law enforcement has violated the plaintiff's constitutional rights on four (5) separate occasions. ¶14, ¶16, ¶17, ¶25, ¶37, ¶39, ¶44   Under the Fourth Amendment, made applicable to the States by the Fourteenth Amendment, the people are 'to be secure in their persons . . . against unreasonable searches and seizures . . . ." *Maryland v. Pringle, 540 U.S. 366, 369 (2003) (quoting U.S. Const. amend. IV.)*. "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (internal citation removed)*. "The common law tort of false arrest is a species of false imprisonment, an action 'derived from the ancient common-law action of trespass [that] protects the personal interest of freedom from restraint of movement.'" *Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 118 (2d Cir.1995) (citing Broughton v. State, 37 N.Y.2d 451, 456 (1975))*.

[23] Mental illnesses, including personality disorders, can potentially modify applications of the law in criminal and civil contexts. Classification and specific definitions of mental disorders can have a major impact on how and when they serve as modifiers.  The legal system's perception of mental illness is defined by society, and it is the application of that understanding to a specific person or fact pattern that defines the relationship between mental illness and the law. Clinicians entering the forensic arena, however, for the most part, do not immerse themselves in thinking about the current social definition or understanding of mental illness.

[24]  NYS Penal Law §40.15 mental disease or defect is invoked when in any prosecution for an offense, it is an affirmative defense that when the defendant engaged in the proscribed conduct, he lacked criminal responsibility by reason of mental disease or defect.  Such lack of criminal responsibility means that at the time of such conduct, as a result of mental disease or defect, he lacked substantial capacity to know or appreciate either:

    1. The nature and consequences of such conduct; or

    2. That such conduct was wrong

**[25]**   New York State Department of Mental Health and Hygiene has stated that in order to be considered an adult with a serious and persistent mental illness, "1" below must be met, in addition to either "2", "3", or "4":

1. Designated                                Mental                                Illness
   The individual is 18 years of age or older and currently meets the criteria for a DSM-IV psychiatric diagnosis other than alcohol or drug disorders, organic brain syndromes, developmental disabilities or social conditions. ICD-CM psychiatric categories and codes that do not have an equivalent in DSM-IV are also included mental illness diagnoses.

And

2. SSI or SSDI due                        to                        Mental                        Illness
   The individual is currently enrolled in SSI/SSDI due to a designated mental illness.

Or

3. Extended Impairment in Functioning due to Mental Illness
   a. Documentation that the individual has experienced two of the following four functional limitations due to a designated mental illness over the past 12 months on a continuous or intermittent basis:
      i.   Marked difficulties in self care (personal hygiene, diet, clothing avoiding injuries, securing health care or complying with medical advice).
      ii.  Marked restriction of activities of daily living (maintaining a residence, using transportation, day to day money management, accessing community services).
      iii. Marked difficulties in maintaining social functioning (establishing and maintaining social relationships, interpersonal interactions with primary partner, children or other family members, friends, neighbors, social skills, compliance with social norms, appropriate use of leisure time).
      iv.  Frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (ability to complete tasks commonly found in work settings or in structured activities that take place in home or school settings, individual's may exhibit limitations in these areas when they repeatedly are unable to complete simple tasks within an established time period, make frequent errors in tasks, or require assistance in the completion of tasks).

Or

4. Reliance      on      Psychiatric      Treatment,      Rehabilitation      and      Supports

12

A documented history shows that the individual at some prior time met the threshold for 3 (above), but the symptoms and/or functioning problems are currently attenuated by medication or psychiatric rehabilitation and supports. Medication refers to psychotropic medications which may control certain primary manifestations of mental disorder; e.g. hallucinations, but may or may not affect functional limitations imposed by the mental disorder. Psychiatric rehabilitation and supports refer to highly structured and supportive settings (e.g. Congregate or Apartment Treatment Programs) which may greatly reduce the demands placed on the individual and thereby, minimize overt symptoms

[26]   On a forensic psychiatric evaluation order by NYiT issued by North Shore University Hospital on April 10, 2006, the plaintiff is diagnosed as: ¶2

Axis 1:309.3 Adjustment Disorder with disturbance of conduct

Axis 2:301.9 Personality Disorder NOS with schizotypal and paranoid features.

Axis 3:None

Axis 4:Educational problems, problems related to social environment.

Axis 5:50

And when assessing risk for violence (HCR-20) from plaintiff's April 10, 2006 forensic psychiatric evaluation states: ¶2

Major Risk Factors for Violence:

Code:         0= Absent     1= Partially/Possibly Present  2= Yes/Present

A. Historical Items

1.  Previous Violence                         0
2.  Young Age at First Violent Incident        0
3.  Relationship Instabilities                 0
4.  Employment Problems                        0
5.  Substance Use Problems                     2
6.  Major Mental Illness                       1
7.  Psychopathy                                0
8.  Early Maladjustment                        0
9.  Personality Disorder                       2
10. Prior Supervision Failure                  0

B.  Clinical Items

|   |   |   |
|---|---|---|
| 1. | Lack of Insight | 2 |
| 2. | Negative Attitudes | 0 |
| 3. | Active Symptoms of Major Mental Illness | 0 |
| 4. | Impulsivity | 0 |
| 5. | Unresponsive to treatment | 0 |

C.  Risk Management Items

|   |   |   |
|---|---|---|
| 1. | Plans Lack Feasibility | 0 |
| 2. | Exposure to Destabilizers | 2 |
| 3. | Lack of Personal Support | 0 |
| 4. | Noncompliance with Remediation Attempts | 0 |
| 5. | Stress | 2 |

[27] Plaintiff is considered an adult with mental illness.  The plaintiff was 25 years of age at the time of diagnoses and currently meets the criteria for a DSM-IV psychiatric diagnosis other than alcohol or drug disorders, organic brain syndromes, developmental disabilities or social conditions.  According to the forensic psychiatric evaluation from North Shore University Hospital ordered by NYiT dated April 10, 2006 plaintiff was diagnosed DSM-IV Axis 5: 50 Global Assessment of Functioning; serious symptoms (e.g.. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). ¶2

[28]  Plaintiff was in NYPD custody on 02/07/14  ¶16, 12/26/15  ¶25  , 05/03/18  ¶37  , on 05/25/18  ¶39 and on 08/18/18 ¶44.  Due to a temporary mental incapacity to protect one's rights, plaintiff could not, because of arbitrary government harassment infringing his first, fourth and 14th amendment rights guaranteed by the Constitution of the United States.  *Camac v. Long Beach City Sch. Dist., No. 09 CV 5309 DRH ARL, 2011 WL 3030345, at *3 (E.D.N.Y. July 22, 2011).*

[29] Plaintiff meets the requirements of New York State Department of Mental Health and Hygiene has stated that in order to be considered an adult with a serious and persistent mental illness.  Due to a temporary mental incapacity to protect one's rights, plaintiff could not function, because of arbitrary government harassment by law enforcement infringing upon his rights guaranteed under the Constitution of the United States.  Marked difficulties in self care (personal hygiene, diet, clothing avoiding injuries, securing health care or complying with medical advice).

The states multiple detentions and false arrest of the plaintiff in invoking the special relations doctrine has caused plaintiff severe problems with self care.  While in the custody of the state plaintiff has been denied medication for ocular inflammation, and instead against his consent has been forced injections of anti-psychotic medications by the state, disabling the plaintiff's ability to function and furthering psychosis ¶23. Marked restriction of activities of daily living (maintaining a residence, using transportation, day to day money management, accessing community services).  Twenty four NYPD harassment has resulted in the encroachment of three suspended licenses within a eighteen month term, while the state charges outlandish driver responsibility assessment fees in violation of the double jeopardy due process of the 5th amendment to the U.S. Constitution.  Plaintiff is homeless living with his elderly parents in between Jamaica Queens and Shirley, NY, with horrendous credit due to student loan repayments, no college diploma and borderline unemployed with restriction on transportation due to police and state harassment. ¶31  Marked difficulties in maintaining social functioning (establishing and maintaining social relationships, interpersonal interactions with primary partner, children or other family members, friends, neighbors, social skills, compliance with social norms, appropriate use of leisure time).  The City of New York has made it impossible for the plaintiff to function while within the five boroughs.  Constant police harassment and false arrests, while the New York City Police Department have told his friends, acquaintances and any women that plaintiff is talking to at any location within the 5 boroughs "Mr. Khalil is a documented schizophrenic, don't talk to him and stay away! He is suicidal!" ¶40  Frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (ability to complete tasks commonly found in work settings or in structured activities that take place in home or school settings, individual`s may exhibit limitations in these areas when they repeatedly are unable to complete simple tasks within an established time period, make frequent errors in tasks, or require assistance in the completion of tasks).  Plaintiff is encountering twenty four hour harassment at the NYC buildings department in violation of 42 U.S. Code § 2000a - Prohibition against discrimination or segregation in places of public accommodation for his protected activity against Pratt Institute and reporting discrimination to the U.S. Department of Education Office of Civil Rights.  Plaintiff life is endangered when in the boundaries of the government agents.  ¶43, ¶45

## Municipality for City of New York

[30] Under *Monell*, a *§ 1983* claim can only be brought against a municipality if the action that is alleged to be unconstitutional was caused by an official policy or custom. Before establishing a causal connection between the policy or custom and the alleged deprivation of a constitutional right, a plaintiff must prove "the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving [official]." *Johnson v. City of New York, No. 06 Civ. 9426(GBD), 2011 U.S. Dist. LEXIS 15867, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (quoting Vippolis v. Vill. of*

*Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985)).*

[31] In order to satisfy the "policy or custom" prong, a plaintiff must allege "(1) a formal policy officially endorsed by a municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising [policymaker] must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon v. City of New York, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)* (internal citations omitted). The policy or custom need not be memorialized in a specific rule or regulation. *Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996)* (citation omitted).

[32] Municipal defendants have engaged in a consistent practice of "wrongfully arresting and hospitalizing individuals who do not require in-patient mental health treatment, and falsifying documents to justify forced psychiatric hospitalizations." Sixteen percent of homicides involving shootings by authorized NYPD handguns are reported to be against emotionally disturbed subjects. The police department maintains a database of classified emotionally disturbed person EDP individuals. NYPD policy consists of blacklisting and singling out and discriminate those individuals with mental disability or classified EDP. The discrimination is intentionally directed at the mentally disabled class. The motivation of the NYPD is to involuntarily commit or confine individuals due to a disability, a motivation to discriminate to single-out for financial gain for the city. Eliminate and punish those individuals that are suffering from disability. The action of the city agents is aggressive, threatening, and is motivated to assist or accelerate the injury, disability or illness.

[33] The New York City Police Department abuse of power and policy was documented in the case of Adrian Schoolcraft v City of New York (15-cv-2311) and on the Norman Seabrook testimony (1:2016-cr-00467). The strategy of law enforcement NYPD utilize is based off of the CompStat—or COMPSTAT and quota system. EDP individuals are denied police reports for incidents at routine car accident or any complaint or dispute. On February 07, 2018 plaintiff was involved in a car accident with NJ plate H83JRH, the responding officers refused to take a report from the plaintiff, and would only communicate with the driver of the black Honda NJ license plate H83JRH. Responding police officers explained that the plaintiff is emotionally disturbed and that if the plaintiff does not leave the scene officers will transport him to the nearest psychiatric center for detention, the plaintiff was then threatened with physical force. As a result the plaintiff suffered harm. The police department has stated the United States Department of Justice authorizes them to use deadly force against emotionally disturbed people if necessary.

[34] On August 2, 2018 NYPD officer Poweska shield #20143 and officer Eling shield #31739 refused plaintiff police assistance after a food truck owner NYS license plate HVF3741 assaulted, threatened then broke the plaintiffs $800 cellular phone because the plaintiff was expressing his first amendment right and video recording threatening behavior.  Responding officers explained that the plaintiff is emotionally disturbed and deserved to have his phone broken because he was videotaping in public, exercising a constitutionally protected activity. The officers threatened the plaintiff with commitment and explained that the police department is "scared" for their lives in the presence of the mentally ill.   On 08/18/18 arresting officer stated that the plaintiff hears voices in his head by FBI agents and that the U.S. Department of Justice has authorized him to use excessive deadly force against the plaintiff, because he is emotionally disturbed and the police force fear for their lives in his presence.   Complainants against EDP individuals are always made aware of the EDP mental health status.   Peace officers routinely harass, threaten and coerce EDP individuals with involuntary commitment, or physical force. *Schoolcraft v. The City of New York et al, No. 1:2010cv06005 - (S.D.N.Y. 2014), Matthews v. City Of New York, No 15-cv-2311 (ALC), 2016 U.S. Dist LEXIS 136907, at \*22 (S.D.N.Y. Sept. 30, 2016.), Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995)), United States v. Seabrook et al - Norman Seabrook (S.D.N.Y. 1:2016-cr-00467),see Kerman v. City of New York*

[35] NYS§240.20 Disorderly conduct.

A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a  risk thereof:

1. He engages  in  fighting or in violent, tumultuous or threatening behavior; or

2. He makes unreasonable noise; or

3. In a public place, he uses abusive or obscene language, or makes an obscene gesture; or

4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or

5. He obstructs vehicular or pedestrian traffic; or

6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or

7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.

Disorderly conduct is a violation.

[36] NYS§240.26 Harassment in the second degree.

A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person:

1. He or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same; or

2. He or she follows a person in or about a public place or places; or

3. He or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose.

Harassment in the second degree is a violation.


[37] Under the third prong, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decision maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law. Therefore, a plaintiff may establish municipal liability by demonstrating that a [policymaker] 'indirectly caused the misconduct of a subordinate municipal employee by acquiescing in a longstanding practice or custom which may fairly be said to represent official policy.'" *Kucharczyk, 95 F. Supp. 3d at 539.*


[38] Municipality participates in a widespread practice of wrongfully hospitalizing individuals and falsifying documents. Plaintiff alleges that this custom may be inferred from repeated occurrences of similar wrongful conduct document by the facts of several civil right actions filed against the municipal defendants. *Schoolcraft v. The City of New York et al, No. 1:2010cv06005 - (S.D.N.Y. 2014), Matthews v. City Of New York, No 15-cv-2311 (ALC), 2016 U.S. Dist LEXIS 136907, at *22 (S.D.N.Y. Sept. 30, 2016.), Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995)), United States v. Seabrook et al - Norman Seabrook (S.D.N.Y. 1:2016-cr-00467),see Kerman v. City of New York*


[39] A failure to train. *See, e.g., Ferrari v. Cnty. of Suffolk, 790 F. Supp. 2d 34, 45 (E.D.N.Y. 2011)* ("It is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." (quoting *Amnesty America v. Town of West Hartford, 361 F.3d 113, 130 n.10 (2d Cir. 2004))); see also Walker, 2014 U.S. Dist. LEXIS 42272, 2014 WL 1259618, at *3* (distinguishing failure-to-train cases from cases alleging a widespread custom). Regarding allegations of a widespread practice, third-party evidence has also been critical to buttressing a list of cases. *See, e.g., White v. City of New York, No. 13 CIV. 7421 KPF, 2015 U.S. Dist. LEXIS 100772, 2015 WL 4601121, at *6 (S.D.N.Y. July 31, 2015)* (relying on a Department of Justice report in denial of motion to dismiss *Monell* claim and collecting cases where DOJ findings have helped plaintiffs allege a widespread policy or practice); *Brown v. City of New York, NO. 08-CV-5095, 2013 U.S. Dist. LEXIS 47035, 2013 WL 133875, at *7* (denying motion to dismiss *Monell* claim after relying on list of settled cases and a statement by a police spokesperson in support of the alleged practices).

[40] To state a claim for municipal liability, a plaintiff must allege (1) an official policy of COMSTAT or COMPSTAT quota system in that the discriminatory and prejudicial policing based on discriminatory intent on disability and abuse of NYSMHL§9.41 And an abuse of authority under New York Consolidated Laws, Criminal Procedure Law - CPL§1.20 peace officers and New York Consolidated Laws, NYCPL§2.10 person designated as peace officers, New York City Administrative Code AC§14-110 warrant of appointment; oath, AC§14-117 assignment to police duty and AC§14-119 department to cooperate with department of health as well as the law of The Rules for the City of New York Title 24 Department of Health and Mental Hygiene and Title 55 Department of Citywide Administrative Services. (2) Causes the plaintiff to be subjected to (3) a denial of his first, fourth and 14th amendment right to the Constitution of the United States.

[41] Article I, Section 8 of the New York State Constitution provide for the protection of free speech. Article I, Section 3 of the New York State Constitution provide for the protection of free speech freedom of worship and religious liberty. Article I, Section 11 of the New York State Constitution provide for the equal protection of laws and the discrimination in civil rights prohibited. Article I, Section 12 of the New York State Constitution provide for the protection of right to security against unreasonable searches, seizures and interceptions.

[42] Under 42 U.S.C. 1985(3) The City of New York has conspired with a private university in portraying the plaintiff as violent. "Substantive due process prohibits states from involuntarily committing non dangerous mentally ill individuals" *see Bolmer v Oliveria, 594 F.3d 134, 142 (2nd Cir 2010).* ¶2, ¶21, ¶22, ¶37, ¶42 City Agents have falsified reports against the plaintiff in violation of NYS§240.50, §240.55 and §240.60, and may be coupled with charges of NYS§120.25 reckless endangerment to portray the plaintiff as a violent risk factor, terrorist or religious extremist, either homicidal or suicidal. ¶21, ¶22, ¶37 (2) For the purposes of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy occurred on 02/07/14, 12/25/15, 05/03/18, 05/25/18 and 08/18/18 when the city agents unlawfully seized the plaintiff in violation of his first, fourth and 14th amendment rights secured or protected under the Constitution of the United States. ¶14, ¶16, ¶17, ¶25, ¶37, ¶39, ¶44 Whereby a person is injured in his person or property or deprived of a right or privileges of a citizen.

[43] "There is... no substantive constitutional right to be free from arbitrary government action as such...The right, to the extent it exists, is the right to be free of arbitrary government action that infringes a protected right." *See O'Conner v Pierson, 426 F.3d 187, 200 n.6 (2d Cir. 2005).* All free people have a protected liberty interest in not being involuntarily committed or confined

to a psychiatric institute or detention center.  An infringement to this plaintiff's first, fourth and 14th amendment right secured or protected under the Constitution of the United States.  The plaintiff developed life disabling illness, mainly glaucoma ¶34, and was denied the opportunity to have the liberty in choosing to practice a religion of his choice.  Defendant's action was so egregious, so outrages, so that it may fairly be said to shock the contemporary conscience. Malicious and sadistic abuses of power which are intended only to oppress or to cause injury and serve no legitimate governmental purpose unquestionably shock the conscience.   The municipality denied the plaintiff the civil liberty in pursuing a livelihood while living a gay social, mentally/physically healthy and free life.  The plaintiff was denied the opportunity to pursue a living as an assistant to a registered architect or professional engineer and having the credentials in becoming a Registered Architect in the State of New York or pursing a living in The City of New York. ¶43

[44] The defendant discriminated against the plaintiff on the basis of race and perceived religion as a Pakistani Muslim/Moslem. The discrimination was intentionally directed at the plaintiffs protected class. ¶41  The defendant's abuse of color of NYSMHL9.41 and depriving the plaintiff of his first, fourth and 14th amendment protection was based on the substantial and motivating factor of hate, due to the plaintiffs' perceived religion and race. ¶41  The plaintiff's race as a Pakistani Muslim/Moslem ¶21, ¶22, ¶41 male was the motivating factor in the discriminatory action.  This requisite intent of ill will, state of mind of hate, was the substantial and motivating factor in defendant's decision to repeatedly attempt to confine or have the plaintiff involuntarily admitted to a psychiatric hospital.  ¶16, ¶17, ¶25, ¶37, ¶39, ¶44  *Brown v. Board of Education of Topeka* (347 U.S. 483)*, Schoolcraft v. The City of New York et al, No. 1:2010cv06005 - (S.D.N.Y. 2014), United States v. Seabrook et al - Norman Seabrook (S.D.N.Y. 1:2016-cr-00467).*  The municipality was motivated on stopping the Pakistani Moslem/Muslim ¶21, ¶22, ¶41 with mental disability ¶2 from having the credentials of aspiring to be an employee to a registered professional Architect or professional engineer in The City of New York.  The state actor was intentionally and willfully blocking the plaintiff the liberty of free expression, religion, speech and the press.

[45] NYS§240.50 Falsely reporting an incident in the third degree.

A person is guilty of falsely reporting an incident in the third degree when, knowing the information reported, conveyed or circulated to be false or baseless, he or she:

1. Initiates or circulates a false report or  warning  of  an  alleged  occurrence  or impending occurrence of a crime, catastrophe or emergency under circumstances in which it is not unlikely that public alarm or inconvenience will result; or

2. Reports, by word or action, to an official or quasi-official agency or  organization having the function of dealing with emergencies involving danger to life or property, an alleged occurrence or impending occurrence of a catastrophe or emergency which did

not in fact occur or does not in fact exist; or

3. Gratuitously reports to a law enforcement officer or agency (a) the alleged occurrence of an offense or incident which did not in fact occur; or (b) an allegedly impending occurrence of an offense or incident which in fact is not about to occur; or (c) false information relating to an actual offense or incident or to the alleged implication of some person therein; or

4. Reports, by word or action, an alleged occurrence or condition of child abuse or maltreatment or abuse or neglect of a vulnerable person which did not in fact occur or exist to:

(a) the statewide central register of child abuse and maltreatment, as defined in title six of article six of the social services law or the vulnerable persons' central register as defined in article eleven of such law, or

(b) any person required to report cases of suspected child abuse or maltreatment pursuant to subdivision one of section four hundred thirteen of the social services law or to report cases of suspected abuse or neglect of a vulnerable person pursuant to section four hundred ninety-one of such law, knowing that the person is required to report such cases, and with the intent that such an alleged occurrence be reported to the statewide central register or vulnerable persons' central register.

Falsely reporting an incident in the third degree is a class A misdemeanor.

[46] NYS§240.55 Falsely reporting an incident in the second degree.

A person is guilty of falsely reporting an incident in the second degree when, knowing the information reported, conveyed or circulated to be false or baseless, he or she:

1. Initiates or circulates a false report or warning of an alleged occurrence or impending occurrence of a fire, explosion, or the release of a hazardous substance under circumstances in which it is not unlikely that public alarm or inconvenience will result;

2. Reports, by word or action, to any official or quasi-official agency or organization having the function of dealing with emergencies involving danger to life or property, an alleged occurrence or impending occurrence of a fire, explosion, or the release of a hazardous substance which did not in fact occur or does not in fact exist; or

3. Knowing the information reported, conveyed or circulated to be false or baseless and under circumstances in which it is likely public alarm or inconvenience will result, he or she initiates or circulates a report or warning of an alleged occurrence or an impending occurrence of a fire, an explosion, or the release of a hazardous substance upon any private premises.

Falsely reporting an incident in the second degree is a class E felony.

[47] NYS§240.60 Falsely reporting an incident in the first degree.

A person is guilty of falsely reporting an incident in the first degree when he:

1. commits the crime of falsely reporting an incident in the second degree as defined in section 240.55 of this article, and has previously been convicted of that crime; or

2. commits the crime of falsely reporting an incident in the third degree as defined in subdivisions one and two of section 240.50 of this article or falsely reporting an incident in the second degree as defined in subdivisions one and two of section 240.55 of this article and another person who is an employee or member of any official or quasi-official agency having the function of dealing with emergencies involving danger to life or property; or who is a volunteer firefighter with a fire department, fire company, or any unit thereof as defined in the volunteer firefighters' benefit law; or who is a volunteer ambulance worker with a volunteer ambulance corporation or any unit thereof as defined in the volunteer ambulance workers' benefit law suffers serious physical injury or is killed in the performance of his or her official duties in traveling to or working at or returning to a firehouse, police station, quarters or other base facility from the location identified in such report; or

3. commits the crime of falsely reporting an incident in the third degree as defined in subdivisions one and two of section 240.50 of this article or falsely reporting an incident in the second degree as defined in subdivisions one and two of section 240.55 of this article and another person suffers serious physical injury or is killed as a result of any vehicular or other accident involving any emergency vehicle which is responding to, operating at, or returning from the location identified in such report.

4. An emergency vehicle as referred to in subdivision three of this section shall include any vehicle operated by any employee or member of any official or quasi-official agency having the function of dealing with emergencies involving danger to life or property and shall include, but not necessarily be limited to, an emergency vehicle which is operated by a volunteer firefighter with a fire department, fire company, or any unit thereof as defined in the volunteer firefighters' benefit law; or by a volunteer ambulance worker with a volunteer ambulance corporation, or any unit thereof as defined in the volunteer ambulance workers' benefit law.

5. Knowing the information reported, conveyed or circulated to be false or baseless and under circumstances in which it is likely public alarm or inconvenience will result, he or she initiates or circulates a report or warning of an alleged occurrence or an impending occurrence of a fire, an explosion, or the release of a hazardous substance upon school grounds and it is likely that persons are present on said grounds.

6. Knowing the information reported, conveyed or circulated to be false or baseless and under circumstances in which it is likely public alarm or inconvenience will result, he or she initiates or circulates a report or warning of an alleged occurrence or impending

occurrence of a fire, explosion or the release of a hazardous substance in or upon a sports stadium or arena, mass transportation facility, enclosed shopping mall, any public building or any public place, and it is likely that persons are present. For purposes of this subdivision, the terms "sports stadium or arena, mass transportation facility or enclosed shopping mall" shall have their natural meaning and the term "public building" shall have the meaning set forth in section four hundred one of the executive law.

Falsely reporting an incident in the first degree is a class D felony.

**False Arrest**

[48] Under the Fourth Amendment, made applicable to the States by the Fourteenth Amendment, the people are 'to be secure in their persons . . . against unreasonable searches and seizures . . . ." *Maryland v. Pringle, 540 U.S. 366, 369 (2003) (quoting U.S. Const. amend. IV.).* "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (internal citation removed).* "The common law tort of false arrest is a species of false imprisonment, an action 'derived from the ancient common-law action of trespass [that] protects the personal interest of freedom from restraint of movement.'" *Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 118 (2d Cir.1995) (citing Broughton v. State, 37 N.Y.2d 451, 456 (1975)).*

[49] "To state a claim of false arrest or imprisonment, a plaintiff must allege that "(1) the defendant intended to confine him [or her] on 02/07/14 and 12/26/15 (2) the plaintiff was conscious of the confinement (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Sinagra *v. City of New York, 7 N.Y.S.3d 286, 288 (N.Y. App. Div. 2015) (citing Broughton v. State of New York, 37 N.Y.2d 451, 456 (1975)).* Confinement can be privileged when a person is seized and detained for a psychiatric evaluation. Under Section 9.41 of the New York Mental Hygiene Law, a police officer "may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." N.Y. Mental Hyg. Law § 9.41. Likewise, a hospital may receive and retain a person alleged to have a mental illness for immediate observation, care and treatment if the person's conduct is likely to result harm to his or her self or others. N.Y. Mental Hyg. Law § 9.39. Liability under the Fourth Amendment does not attach if there is probable cause to believe that the seized individual was a danger to himself or others. *See Anthony v. City of New York, 339 F.3d 129, 137 (2d Cir. 2003).*

[50] "Under New York law, '[o]ne who wrongfully accuses another of criminal conduct and induces or procures that person's arrest may be liable for false arrest.'" *Croft v. Greenhope Servs. for Women, Inc., No. 13-CV-2996, 2013 WL 6642677, at *5 (S.D.N.Y. Dec. 17, 2013)*

(alterations in original) (quoting *Dunn v. City of Syracuse, 443 N.Y.S.2d 463, 464 (1981)*). While the plaintiff must prove that the defendant intended or instigated his confinement, a civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution. *Kraft v. City of New York, 696 F. Supp. 2d 403, 421-22 (S.D.N.Y. 2010), aff'd, 441 F. App'x 24 (2d Cir. 2011) (quotation marks and citations omitted) (emphasis in original)*. "Generally a civilian defendant who furnishes information to law enforcement authorities who are then free to exercise their own independent judgment as to whether an arrest will be made and criminal charges filed will not be held liable for false arrest or false imprisonment." *Barua v. Barua, No. 14-CV-5107 MKB, 2015 WL 4925028, at \*4 (E.D.N.Y. Aug. 18, 2015) (citations and quotation marks omitted); see also Mitchell v. Home, 377 F. Supp. 2d 361, 376 (S.D.N.Y. 2005) (collecting cases)*.

[51] Plaintiff has sufficiently alleged that there were no facts for the NYPD officer John Doe 1 and John Doe 2 to establish probable cause for his arrest and evaluation on 02/07/14. NYPD officer John Doe 1 and John Doe 2 along with DCDA officers John Doe 1 and John Doe 2 and EMT technicians John Doe 1, John Doe 2, and John Doe 3 responded to a report that a bookshelf had fallen near the Plaintiff apartment and screams can be heard for either, as Maria Doe stated, "I need help" and Jonathon Efraim stated, "I need heroin" or as the NYPD phone operator to the plaintiffs father, "evidence that Mr. Khalil was suicidal and a heroin abuser." Plaintiff alleges that his behavior did not suggest he was in need of medical or psychiatric care, under the influence of illegal drugs, or mentally ill. Instead, Plaintiff alleges that he was "not home when the city peace officer's  NYPD John Doe 1-2, DCDA John Doe 1-2 and EMT John Doe 1-2 illegally searched my apartment, and later found me intoxicated, walking in the hallway after the unlawful search on February 7, 2014.  Public intoxication is not a crime in the state of New York.  Unlike other states throughout the country, ie West Virginia Code §60-6-9 Intoxication or drinking in public, New York State does not enforce public intoxication.  And when they found me walking peacefully they used excessive physical force for the takedown then restrained me and detained me against my consent on 02/07/14." ¶16, ¶17

[52] Under the special relationship doctrine the state had assumed control over the plaintiff on 02/07/14.   EMT technicians John Doe 1, John Doe 2, and John Doe 3 as well as the Queens General Hospital Medical Doctors and staff where both aware that the detainee is a sarcodosis patient suffering from systematic inflammation, mainly ocular sarcodosis.  Although the city employees were aware that the plaintiff has been diagnosed with systematic sarcodosis in the lungs, kidney, spleen, liver, pancreas, and skin, ¶27 the hospital did not provide the medication of the eye drop predforte 1 drop every hour, bromday 1 drop per day,  cyclogyl 3 drops per day, or the oral medication of prednisone 5mg a day for sarcodosis.  As a result of the arbitrary

government harassment infringing on constitutional rights and NYPD aggressive EDP policy the plaintiff is now having trouble administering the methrotrexate chemotherapy and medications and thereby resulting in the onset of secondary glaucoma ¶34. The New York State Department of Mental Health and Hygiene has stated that in order to be considered an adult with a serious and persistent mental illness taking medications on time holds very serious implications, and can lead to DSM-4 AXIS 3: physical impairment. As a result the plaintiff suffered harm when on 01/12/18 plaintiff was diagnosed with secondary uvetic glaucoma ¶23, ¶34. As a result of the arbitrary government harassment and NYPD aggressive EDP policy the plaintiff has encroached three (3) suspended licenses within 18 months, disabled due transportation reasons.

**[53]** NYS§120.00 Assault in the third degree.

A person is guilty of assault in the third degree when:

1. With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or

2. He recklessly causes physical injury to another person; or

3. With criminal negligence, he causes physical injury to another person by means of a deadly weapon or a dangerous instrument.

Assault in the third degree is a class A misdemeanor.

**[54]** NYS§120.14 Menacing in the second degree.

A person is guilty of menacing in the second degree when:

1. He or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument or what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; or

2. He or she repeatedly follows a person or engages in a course of conduct or repeatedly commits acts over a period of time intentionally placing or attempting to place another person in reasonable fear of physical injury, serious physical injury or death; or

3. He or she commits the crime of menacing in the third degree in violation of that part of a duly served order of protection, or such order which the defendant has actual knowledge of because he or she was present in court when such order was issued, pursuant to article eight of the family court act, section 530.12 of the criminal procedure law, or an order of protection issued by a court of competent jurisdiction in another state, territorial or tribal jurisdiction, which directed the respondent or defendant to stay away from the person or persons on whose behalf the order was issued.

Menacing in the second degree is a class B misdemeanor

**[55]** NYS§120.25 Reckless endangerment in the first degree.

A person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person.

Reckless endangerment in the first degree is a class D felony.

[56] NYS§120.35 Promoting a suicide attempt; when punishable as attempt to commit murder.

A person who engages in conduct constituting both the offense of promoting a suicide attempt and the offense of attempt to commit murder may not be convicted of attempt to commit murder unless he causes or

Promoting a suicide attempt in the first degree is a class E felony.

[57] Plaintiff has sufficiently alleged that there were no facts for the NYPD officer John Doe 3 and John Doe 4 to establish probable cause for his arrest and evaluation on 12/26/15. NYPD officer John Doe 3 and John Doe 4 along with DCDA officers John Doe 3 and John Doe 4 and EMT technicians John Doe 4, John Doe 5, and John Doe 6 because of a complaint plaintiff placed to the NYPD Internal Affairs Bureau against several NYPD officers. Plaintiff alleges that his behavior did not suggest he was in need of medical or psychiatric care, under the influence of illegal drugs, or mentally ill. Instead, Plaintiff alleges that he "has received ongoing NYPD stalking and harassment in violation of NYS penal code for making complaints with the Internal Affairs unit and CCRB, a division within the NYPD and the City of New York. So when I reported criminal conduct on part of the armed officer of the state, the city peace officers NYPD officer John Doe 3 and John Doe 4 along with DCDA officers John Doe 3 and John Doe 4 and EMT technicians John Doe 4 and John Doe 5 retaliated and illegally entered and searched my apartment, and illegally detained me on December 26, 2015 against my consent." ¶25

[58] In analyzing whether retaliation occurred, establish: (1) the complainant engaged in a protected activity when he reported wrongful conduct to the Internal Affairs Bureau a division of the NYPD and Civilian Complaint Review Board CCRB; (2) the municipality was aware of the complainant's protected activity under to the intercorporate conspiracy doctrine; (3) the complainant suffered an adverse action contemporaneous with, or subsequent to, the recipient's learning of the complainant's involvement in the protected activity of the IAB and CCRB complaints; and (4) there is a connection between the protected activity and the adverse action from which a retaliatory motivation reasonably may be inferred. The city agents continued to abuse color of NYSMHL§9.41and deprive the plaintiff of his first, fourth and fourteenth amendment protected right. ¶16, ¶17, ¶25, ¶37, ¶39, ¶44

[59] The plaintiff engaged in a protective activity on 02/08/14 when he made complaints to the Internal Affairs Bureau IAB and Civilian Complaint Review Board CCRB against NYPD officers John Doe 1 and John Doe 2 as well as DCDA officers John Doe 1 and John Doe 2 (¶x).

The NYPD and Internal Affairs Bureau IAB work under the same New York City Police Department city agency. The plaintiff suffered an adverse action when the municipality begun to falsify reports against him to further the conspiracy with the private university in violation of NYS§240.50, §240.55 and §240.60, ¶21,¶22, ¶37 and used city agents acting within the scope of their duty to harass, threaten and intimidate the plaintiff. Agents of The City of New York continue to harass and intimidate with use of excessive physical force in injury with displaying a deadly weapon 02/07/14, 12/26/15, 05/13/18, 05/25/18, and on 8/18/18. ¶16, ¶17, ¶25, ¶37, ¶39, ¶44

[60] In law, selective enforcement occurs when government officials such as police officers, prosecutors, or regulators exercise enforcement discretion, which is the power to choose whether or how to punish a person who has violated the law. The biased use of enforcement discretion, such as that based on racial prejudice or corruption, is usually considered a legal abuse and a threat to the rule of law.

[61] Under the special relationship doctrine the state had assumed control over the plaintiff on 12/25/15. EMT technicians John Doe 4, John Doe 5, and John Doe 6 as well as the Queens North Shore Hospital Medical Doctors and staff where both aware that the detainee is a sarcodosis patient suffering from systematic inflammation, mainly ocular sarcodosis. Although the city employees were aware that the plaintiff has been diagnosed with systematic sarcoidosis in the lungs, kidney, spleen, liver, pancreas, and skin, ¶27 the hospital did not provide the medication of the eye drop predforte 1 drop every hour, bromday 1 drop per day, cyclogyl 3 drops per day, or the oral medication of prednisone 5mg a day for sarcoidosis. As a result of the arbitrary government harassment and NYPD aggressive EDP policy the plaintiff is now having trouble administering the methrotrexate chemotherapy and medications and thereby resulting in the onset of glaucoma ¶34. The New York State Department of Mental Health and Hygiene has stated that in order to be considered an adult with a serious and persistent mental illness taking medications on time holds very serious implications, and can lead to DSM-4 AXIS 3: physical impairment. As a result the plaintiff suffered harm when on 01/12/18 plaintiff was diagnosed with secondary uvetic glaucoma ¶23, ¶34. As a result of the arbitrary government harassment and NYPD aggressive EDP policy the plaintiff has encroached three (3) suspended licenses within 18 months, disabled due transportation reasons.

[62] NYS§120.00 Assault in the third degree.
    A person is guilty of assault in the third degree when:
    1. With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or
    2. He recklessly causes physical injury to another person; or

3. With criminal negligence, he causes physical injury to another person by means of a deadly weapon or a dangerous instrument.

Assault in the third degree is a class A misdemeanor.

[63] NYS§120.14 Menacing in the second degree.

A person is guilty of menacing in the second degree when:

1. He or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument or what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; or

2. He or she repeatedly follows a person or engages in a course of conduct or repeatedly commits acts over a period of time intentionally placing or attempting to place another person in reasonable fear of physical injury, serious physical injury or death; or

3. He or she commits the crime of menacing in the third degree in violation of that part of a duly served order of protection, or such order which the defendant has actual knowledge of because he or she was present in court when such order was issued, pursuant to article eight of the family court act, section 530.12 of the criminal procedure law, or an order of protection issued by a court of competent jurisdiction in another state, territorial or tribal jurisdiction, which directed the respondent or defendant to stay away from the person or persons on whose behalf the order was issued.

Menacing in the second degree is a class B misdemeanor

[64] NYS§120.25 Reckless endangerment in the first degree.

A person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person.

Reckless endangerment in the first degree is a class D felony.

[65] NYS§120.35 Promoting a suicide attempt; when punishable as attempt to commit murder.

A person who engages in conduct constituting both the offense of promoting a suicide attempt and the offense of attempt to commit murder may not be convicted of attempt to commit murder unless he causes or

Promoting a suicide attempt in the first degree is a class E felony.

[66] Defendants also seek qualified immunity from suit for the false arrest. Qualified immunity "shields public officials performing discretionary functions from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." *Bradway v. Gonzales, 26 F.3d 313, 317-18 (2d Cir. 1994) (internal citations and quotation marks omitted).*

[67] "In the case of allegations to which probable cause is a complete defense, such as false arrest or imprisonment, the Second Circuit has defined the standard of qualified immunity as one of 'arguable probable cause.'" *Betts v. Shearman, No. 12 CIV. 3195 JPO, 2013 WL 311124, at *4 (S.D.N.Y. Jan. 24, 2013), (footnote and citation omitted) aff'd, 751 F.3d 78 (2d Cir. 2014).* Arguable probable cause exists when "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law." *Cerrone v. Brown, 246 F.3d 194, 202-03 (2d Cir. 2001) (emphasis in original) (citation and quotation marks omitted)*" "Kerman v. City of New York makes clear that, to determine whether a mental-health seizure is justified by arguably probable cause, a court must review the specific observations and information available to the officers at the time of the seizure." *Myers v. Patterson, 819 F.3d 625, 633 (2d Cir. 2016).*

[68] It is evident that qualified immunity is inappropriate. On 02/07/14 and 12/25/15 City Defendants responded to the 911 call and observed Plaintiff acting in no way to suggest that "he was in need of medical or psychiatric care, was on illegal drugs, was mentally ill, or posed a danger to herself or others." Plaintiff alleges that the EMTs and officers took him into custody against his will. ¶16, ¶25

[69]The police officer is also liable for failure to intervene. A claim for failure to intervene is grounded in the widely recognized rule that "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).* There is no dispute that Plaintiff must allege and eventually prove that the defendants were aware of the underlying unlawful conduct, had a realistic opportunity to intervene to prevent the harm, and failed to do so. *See Anderson, 17 F.3d at 557.* Without discovery, he is unable to identify the roles of the officers. Officers were present in the building of the lobby during this alleged violation. In situations similar to this, courts have denied a motion to dismiss in order to allow greater clarification of the facts after discovery. *See, e.g., Sanabria v. Detective Shawn Tezlof, No. 11-CV-6578 (NSR), 2016 U.S. Dist. LEXIS 107104, 2016 WL 4371750, at *6 (S.D.N.Y. Aug. 12, 2016)* "If the officer was a direct participant in the excessive force violation, the failure to intervene theory will be inapplicable. The determination of who was specifically involved in the beating will be left to discovery."; *c.f. Terebesi v. Torreso* "Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless considering all

the evidence a reasonable jury could not possibly conclude otherwise.", *764 F.3d 217, 244 (2d Cir. 2014), cert. denied sub nom. Torresso v. Terebesi, 135 S. Ct. 1842, 191 L. Ed. 2d 723 (2015).* Furthermore, "the failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim." *Matthews v. City of New York, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012).* Plaintiff properly alleges "at least one constitutional violation, plaintiff is entitled to discovery to determine which officers participated directly in the alleged constitutional violations and which officers were present and failed to intervene."

### Selective Enforcement

[70]   In law, selective enforcement occurs when government officials such as police officers, prosecutors, or regulators exercise enforcement discretion, which is the power to choose whether or how to punish a person who has violated the law. The biased use of enforcement discretion, such as that based on racial prejudice or corruption, is usually considered a legal abuse and a threat to the rule of law.

[71] *Wayte v. United States 470 U.S. 598 (1985)* said, "In our criminal justice system, the Government retains "broad discretion" as to whom to prosecute. [...] This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."

[72] *Yick Wo v. Hopkins (1886)* was the first case where the United States Supreme Court ruled that a law that is race-neutral on its face, but is administered in a prejudicial manner, is an infringement of the equal protection clause in the Fourteenth Amendment to the Constitution of the United States.

[73] Plaintiff's persistent complaints against an alleged bipolar stalker meet the criteria for strange behavior when enforcing NYSMHL§9.41 in a non prejudicial manner. ¶40   On November 1, 2012 plaintiff asserted his liberty of speech and published several online complaints against his alleged stalker on ripoffreport.com, whoscammedyou.com and other online reputation complaint boards, as a result the bipolar stalker occasionally contacts him throughout the years. ¶40   Article I, Section 8 of the New York State Constitution provide for the protection of free speech.  Article I, Section 3 of the New York State Constitution provide for the protection of free speech freedom of worship and religious liberty. The alleged bipolar female stalker is one with a history of psychiatric hospitalizations and medications, and is in violation of NYS penal code § 240.30, when threatening plaintiff's wellbeing through ongoing

electronic and telephone harassment and stalking.

[74]A person is guilty of aggravated harassment in the second degree when:

    1. With intent to harass another person, the actor either:

        (a)  communicates, anonymously or otherwise, by telephone, by computer or any other electronic means,  or  by  mail,  or  by  transmitting  or delivering any other form of communication, a threat to cause physical harm to, or unlawful harm to the property of, such person, or  a  member of  such person's same family or household as defined in subdivision one of section 530.11 of the criminal procedure law, and the actor knows  or reasonably should know that such communication will cause such person to reasonably fear harm to such person's physical safety or property, or to the physical safety or property of a member of such person's same family or household; or

        (b)  causes  a communication to be initiated anonymously or otherwise, by telephone,  by computer or any other electronic means, or by mail,  or by transmitting or delivering any other form of communication, a threat to cause physical harm to, or unlawful harm to  the  property of,  such person, a member of such person's same family or household as defined in subdivision one of section 530.11 of the criminal procedure law, and the actor knows or reasonably should know that such communication will cause such  person to reasonably fear harm to such person's physical safety or property, or to the physical safety or property  of  a  member  of  such person's same family or household; or

    2. With intent to harass or threaten another person, he or she makes a telephone call, whether  or not a conversation ensues, with no purpose of legitimate communication; or

    3. With the intent to harass, annoy, threaten or alarm another person, he  or  she strikes, shoves, kicks, or otherwise subjects another person to physical contact, or attempts or threatens to do the same because of a  belief  or  perception  regarding such person's race, color, national origin, ancestry, gender, religion, religious practice, age,  disability or sexual orientation, regardless of whether the belief or perception is correct; or

    4. With the intent to harass, annoy, threaten or alarm another person, he or she strikes, shoves, kicks or otherwise subjects another person to physical  contact thereby causing physical injury to such person or to family or household member of such person as defined in  section  530.11of the criminal procedure law; or

    5. He  or she commits the crime of harassment in the first degree and has previously been convicted of the crime of harassment  in  the  first degree as defined by section 240.25 of this article within the preceding ten years.

Aggravated harassment in the second degree is a class A misdemeanor.

[75]City defendants are in violation of the Due Process and Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States, when failing to enforce NYS MHL§9.41 against an individual with a history of suicide for violating NYS penal code §240.30 aggregated harassment when plaintiff asserted his first amendment right and published online postings against an alleged bipolar stalker. ¶13, ¶40 Article I, Section 11 of the New York State Constitution provide for the equal protection of laws and the discrimination in civil rights prohibited. The biased use of enforcement discretion, such as that based on racial prejudice or corruption, is usually considered a legal abuse and a threat to the rule of law. *Yick Wo v. Hopkins (1886) Camac v. Long Beach City Sch. Dist., No. 09 CV 5309 DRH ARL, 2011 WL 3030345, at \*3 (E.D.N.Y. July 22, 2011) See Anthony v. City of New York, 339 F.3d 129, 137 (2d Cir. 2003).*

[76] Plaintiff was treated differently from other similarly situated individuals. The plaintiff's has no history of psychiatric hospitalizations or medications, nor is the plaintiff suicidal or homicidal or exhibit any sense of aggressive or violent behavior, standing at 5'-7" and weighing in at 130 pounds suffering from an auto immune disease being treated with chemotherapy. ¶2, ¶6, ¶12, ¶26, ¶27, ¶34, ¶36 The City of New York have unlawfully detained the plaintiff under NYSMHL§9.41 on 02/07/14, 12/26/15, 05/03/18, 05/25/18, and 08/18/18. ¶16, ¶17, ¶25, ¶37, ¶39, ¶44 The city has abused color of NYSMHL§9.41 in a prejudicial manner and as a result city employees are in violation of falsifying reports against the plaintiff in violation of NYS§240.50, §240.55 and §240.60, and may be coupled with charges of NYS§120.25 reckless endangerment, NYS§120.35 promoting a suicide attempt when punishable as attempt to commit murder as well as NYS§120.14 menacing in the second degree. ¶21,¶22, ¶37 Although Natalie Becerra, an alleged bipolar female stalker self mutilator, cutter, with a history of psychiatric hospitalizations and medications presents herself with gashes on her wrists from attempted suicide, and exhibiting strange behavior with longstanding persistent violation of NYS§240.30. ¶13, ¶40 Becerra continuously calls the plaintiffs cellular phone with blocked numbers, and contacts the plaintiff pretending to be fake people via internet for months at a time throughout the year and for years and years, by definition strange behavior. ¶40 Unusual or strange behavior is behavior that is not appropriate to the circumstances. It occurs when a person is unnaturally moody, aggressive, euphoric, or mild-tempered. Fluctuations in mood from time to time are normal. However, unusual reactions to events may be a sign of a medical or mental disorder. *See Matthews v. City of New York, No. 15-cv-2311, 2016 U.S. dist LEXIS 136907, at \*22 (S.D.N.Y. Sept. 30, 2016).* Unusual behavior is behavior that can threaten or alarm the well being of others. Plaintiff was treated differently from other similarly situated individuals. ¶40 The differential treatment was based on impermissible consideration such as race, religion, intent to inhibit or punish the exercise of a first amendment right to the liberty of speech, press, and expression or malicious or bad faith with intent to injure the plaintiff.

[77] Failure to provide police protection and special relationship exception applies in this incident. "A municipality's duty to provide police protection is ordinarily one owed to the public at large and not to any particular individual or class of individuals." *See Cuffy vs City of New York.*  The first element a plaintiff must prove is an assumption by the municipality, through promise or action, of an affirmative duty to act on behalf of the society, which the municipality promised when enforcing NYSMHL§9.41 and it was their affirmative duty in protecting society. Second, it must be shown that the municipality's agents knew inaction could lead to harm, when allowing an alleged bipolar stalker to continually exhibit strange behavior and contact her victim with no repercussions for her behavior and created a danger to the well being of herself as well as the plaintiff. ¶13, ¶40  The municipality acted with intent to harm when failing to enforce NYS§240.30 Aggravated Harassment in the second and so as to fail at the affirmative duty or failure to enforce NYSMHL§9.41 in a non prejudicial manner.

[78]The city acted in gross negligence and with requisite intent of ill will. Defendant's action was so egregious, so outrages, that it may fairly be said to shock the contemporary conscience. Malicious and sadistic abuses of power which are intended only to oppress or to cause injury and serve no legitimate governmental purpose unquestionably shock the conscience.  The plaintiff notified the NYPD and demanded protection for and from the alleged bipolar stalker after the NYPD unlawfully detention on 02/07/14.  ¶16   The NYPD IAB lieutenant investigating the 02/07/14 excessive force complaint assured the plaintiffs that something would be done and the officer would contact FBI Special Agent Steve Byrnes, ¶20 which constituted an affirmative undertaking by the municipality.  Based on the medical history of the alleged bipolar female stalker, the police should have known that inaction could lead to harm.  In the Court of Appeals case of Sorichetti v. City of New York, the Court found that "when police are made aware of a possible violation, they are obligated to respond and investigate, and their actions will be subject to a reasonableness review."  The third requirement is some form of direct contact between the injured person and the municipality. The Court in Cuffy determined that the element of direct contact is necessary where an injured person's relationship with the police went beyond that which the police had with the general public. This requirement "limit[s] the class of citizens" who may claim a special relationship in the event of the police failing to provide protection." The NYPD unlawfully detained the plaintiff on 02/07/14, 12/26/15, 05/03/18, 05/25/18 and 08/18/18 under MHL 9.41. ¶16, ¶17, ¶25, ¶37, ¶39, ¶44  There was direct contact with the plaintiff and law enforcement and city officials which went beyond that of the NYPD or city officials had with the general public.   The plaintiff is a registered class 2 filing representative with the New York City Buildings Department as well as a certificate of fitness holder with the Fire Department for the City of New York.  Several employees at the NYC Department of Buildings, NYC Department of Environmental Protection, NYC Department of Finance and Taxation, NYC Parks Department as well as NYC Department of Transportation, commissioners and fire marshals know and have meet with the plaintiff to discuss applications for construction within The City of New York. ¶19  The plaintiff regularly works as a junior architect through the

NYC Buildings Department in contact with borough commissioners in all 5 boroughs as well as plan examiners and borough staff, as well as the Fire Marshal's office to meet to discuss plans for fire alarm systems and fire suppression systems. ¶19 The last element established by the Court in Cuffy is that the individual must have justifiably relied on the municipality's affirmative undertaking. The individual's reliance must be based on something more than the mere hope or expectation that protection would be provided. To establish the individual's justifiable reliance, the plaintiff must show that the municipality's actions lulled the individual into a false sense of security and induced him to either relax his own vigilance or forego other avenues of protection, thereby placing the individual in a worse position than he would have been had the municipality never assumed the duty. FBI Special Agent Steve Byrnes instructed the plaintiff to contact the NYPD, the NYPD had asserted that they would look into it by contacting FBI Special Agent Steve Byrnes, no action was taken by either law enforcement agency and as a result the plaintiff suffered harm. ¶20 The plaintiff pursued other avenues of protection in taking civil action in district court, thereby placing the individual in a worse position than he would have been had the municipality never assumed the duty.

[79] Liberties are the freedom in choosing, saying, publishing or petitioning granted under the Constitution of the United States. The defendant has denied the plaintiff the liberty of speech. When plaintiff asserted his liberty of constitutionally protected speech, and posted complaints against Natalie Becerra via internet complaint board ripoffreport and whoscammedyou.com, the city employees violated 42 U.S.C. § 242 deprivation of rights under color of law. The state and federal government was aware of the postings, as FBI Special Agent Steve Byrnes and plaintiff did discuss postings on whoscammedyou.com. FBI Special Agent Steve Byrnes explained to the plaintiff that he was expected to contact the NYPD. ¶20

[80] Defendant action was so egregious, so outrages, that it may fairly be said to shock the contemporary conscience. Malicious and sadistic abuses of power which are intended only to oppress or to cause injury and serve no legitimate governmental purpose unquestionably shock the conscience. The plaintiff was denied his substantial due process rights of life and liberty due to the action of the state and federal employees. The plaintiff developed life disabling illness, mainly glaucoma ¶34, and was denied the opportunity to live a gay financially secure life pursing a living as a professional architect registered within the United States. ¶43

## Conclusion

[81] Negligence is a tort which arises from the breach of the duty of care owed by one person to another from the perspective of a reasonable person. Brown v. Kendall, Donoghue v Stevenson [1932] AC 562. (1) The plaintiff was owed a duty of care through the laws and rights granted

and protected under the Constitution of the United States and the rights under The New York State Constitution. There was a dereliction or breach of that duty to provide when the municipality failed to provide equal protection and due process of rights in compliance with federal and state law. (3) The tortfeasor directly caused the symptoms of mental illness, and the onset of secondary glaucoma.

[82]    During the last 10 years, the medical literature has repeatedly called for a psychotherapeutic intervention for patients affected with Sarcoidosis. [Curtis JR, Borson S. Examining the link between sarcoidosis and depression. American Journal of Respiratory and Critical Care Medicine. 2001;163(2):306–308, De Vries J, Drent M. Relationship between perceived stress and sarcoidosis in a Dutch patient population. Sarcoidosis Vasculitis and Diffuse Lung Diseases. 2004;21(1):57–63, Goracci A, Fagiolini A, Martinucci M, et al. Quality of life, anxiety and depression in Sarcoidosis. General Hospital Psychiatry. 2008;30(5):441–445, Ireland J, Wilsher M. Perceptions and beliefs in sarcoidosis. Sarcoidosis Vasculitis and Diffuse Lung Diseases. 2010;27(1):36–42.] Psychotherapeutic intervention aimed at modifying the perception of the state of disease, the emotional influence of stressful events, and the depressive state.

## IV.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

**Mental illness (adjustment disorder), complications and metastasis of an auto-immune disease, loss of employment (adjustment disorder)**

## V.    Relief

State briefly what you want the court to do for you.   Make no legal arguments. Do not cite any cases or statutes.  If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

| | |
|---|---|
| 1. Deformation/Libel | $14,000,000.00 |
| 2. Negligence | $30,000,000.00 |
| 3. Tort | $15,000,000.00 |
| 4. Damages | $51,000.00 |
| **TOTAL AMOUNT CLAIMED:** | $60,050,000.00 |

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: **September 10, 2018**

Signature of Plaintiff

Printed Name of Plaintiff:    **Adil Khalil**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Adil Khalil, | Case No. |
| **-against-** | **2:17-CV-01729 (JFB)(SIL)** |
| City of New York, New York Police Department Officer 'John Doe 1-4', Department of Citywide Administrative Services Officer 'John Doe' 1-4, Paramedic EMT Technicians 'John Doe' 1-6 | **Affirmation of Service** |

I, Adil Khalil, declare under penalty of perjury that I served a copy of the following documents

(1) Second Amended Complaint dated September 10, 2018, and

(2) Declaration of supported exhibits dated September 10, 2018.

via United States Postal Service (USPS) on the defendant at the following address:

**Zachary W. Carter and/or David Cooper**
**Corporation Counsel of the City of New York**
**100 Church Street**
**New York, N.Y. 10007**

Date:
September 10, 2018

BY: _____ Adil Khalil; Plaintiff *(Pro Se)*
158 Broadway
Shirley, N.Y. 11967

**TO:**  Honorary Joseph Bianco
100 Federal Plaza
Central Islip, N.Y. 11722

cc: Zachary W. Carter and David Cooper

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

Adil Khalil,

  **-against-**

City of New York, New York Police Department
Officer 'John Doe 1-4', Department of Citywide
Administrative Services Officer 'John Doe' 1-4,
Paramedic EMT Technicians 'John Doe' 1-6

Case No.

**2:17-CV-01729 (JFB)(SIL)**

**Declaration**

## DECLARATION OF SUPPORTED EXHIBITS

I Adil Khalil declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Declaration is submitted in support of appeal and solely to introduce the documents set forth herein.

Exhibit 1
    Attached as "Exhibit 1" is a true and correct copy of a letter from NYiT to the plaintiff dated 12-13-04.

Exhibit 2
    Attached as "Exhibit 2" is a true and correct copy of the plaintiff's forensic psychiatric evaluation at North Shore University Hospital dated 04/10/06. *Modified to comply Fed. R. Civ. P. 5.2*

Exhibit 3
    Attached as "Exhibit 3" is a true and correct copy of the campus directory  from the Pratt Institute website.

Exhibit 4
    Attached as "Exhibit 4" is a true and correct copy of a Fall 2010 Pratt Institute Degree Project Research syllabus.

Exhibit 5
Attached as "Exhibit 5" is a true and correct copy of a Fall 2010 Pratt Institute Degree
Project Research syllabus.

Exhibit 6
Attached as "Exhibit 6" is a true and correct copy of a letter from Fromer Eye Centers to
plaintiffs primary care physician dated 11-03-10.

Exhibit 7
Attached as "Exhibit 7" is a true and correct copy of the plaintiffs Fall 2010 Pratt
Institute Degree Project Research proposal.

Exhibit 8
Attached as "Exhibit 8" is a true and correct copy of a letter from Pratt Institute t the
plaintiff dated 12-21-10.

Exhibit 9
Attached as "Exhibit 9" is a true and correct copy of an email from the Vice President at
Pratt Institute to the plaintiff dated 02-03-11

Exhibit 10
Attached as "Exhibit 10"  is a true and correct copy of a letter from the U.S. Department
of Education Office of Civil Rights (DoJ) dated 03-17-11.

Exhibit 11
Attached as "Exhibit 11" is a true and correct copy of an email from the Vice President
at Pratt Institute to the Associate Registrar at Pratt Institute dated 05-09-11.

Exhibit 12
Attached as "Exhibit 12" is a true and correct copy of the letter from the ophthalmalic
surgeon dated 09-27-11.

Exhibit 13
Attached as "Exhibit 13" is a true and correct copy of the a posting posted on the
complaint board at whoscammedyou.com on 04-13-13.

Exhibit 14
Attached as "Exhibit 14" is a true and correct copy of the pictures of an NYPD
emotionally disturbed person operation conducted on 02-07-14.

Exhibit 15
Attached as "Exhibit 15" is a true and correct copy of the pictures of the plaintiff's
automobile the day after making an Internal Affairs complaint against several NYPD
officers on approx 02-08-14.

Exhibit 16
Attached as "Exhibit 16" is a true and correct copy of FDNY prehospital care report
summary dated 02-07-14.

Exhibit 17

Attached as "Exhibit 17" is a true and correct copy of FDNY prehospital care report summary dated 02-08-14.

Exhibit 18

Attached as "Exhibit 18" is a true and correct copy of a request for an NYPD Freedom of Information Request dated 04-08-14.

Exhibit 19

Attached as "Exhibit 19" is a true and correct copy of 1RCNY 104-24 along with identification cards for the NYC Buildings Department and a Certificate of Fitness from the FDNY.

Exhibit 20

Attached as "Exhibit 20" is a true and correct copy of a letter from the U.S. Department of Justice; Federal Bureau of Investigations to the plaintiff dated 11-17-14.

Exhibit 21

Attached as "Exhibit 21" is a true and correct copy of a incident report of harassment at 210 Joralemon Street dated 11-20-14.

Exhibit 22

Attached as "Exhibit 22" is a true and correct copy of a incident report of harassment at 210 Joralemon Street dated 11-20-14.

Exhibit 23

Attached as "Exhibit 23" is a true and correct copy of a letter from the ophthalmalic surgeon to the plaintiff dated 11-28-14.

Exhibit 24

Attached as "Exhibit 24" is a true and correct copy of a letter from the superintendent of the plaintiff's residential building in Queens to the court dated 08-08-15.

Exhibit 25

Attached as "Exhibit 25" is a true and correct copy of FDNY prehospital care report summary dated 12-26-15.

Exhibit 26

Attached as "Exhibit 26" is a true and correct copy of a surgical pathology reportwith addendum dated 09-01-16

Exhibit 27

Attached as "Exhibit 27" is a true and correct copy of a letter from the Mount Sinai School of Medicine Cancer center to the plaintiff dated 11-18-16.

Exhibit 28
> Attached as "Exhibit 28" is a true and correct copy of a facebook alert from Pratt Institute School of Information regarding the Federal Bureau of Investigation dated 03-02-17.

Exhibit 29
> Attached as "Exhibit 29" is a true and correct copy of a letter from the plaintiff to former attorney James LeBow dated 04-18-17.

Exhibit 30
> Attached as "Exhibit 30" is a true and correct copy of an SF-95 form to the U.S. Air Force dated 04-18-17.

Exhibit 31
> Attached as "Exhibit 31" is a true and correct copy of correspondence from the U.S. Department of Education dated 08-30-17.

Exhibit 32
> Attached as "Exhibit 32" is a true and correct copy of correspondence from the State Bar of Texas dated 09-11-17.

Exhibit 33
> Attached as "Exhibit 33" is a true and correct copy of FBI Special Agent Robert P Duffy's business card.

Exhibit 34
> Attached as "Exhibit 34" is a true and correct copy of a letter from the NY Eye and Ear emergency room to the court dated 01-19-18.

Exhibit 35
> Attached as "Exhibit 35" is a true and correct copy of correspondence from the State Bar of Texas dated 01-23-18

Exhibit 36
> Attached as "Exhibit 36" is a true and correct copy of a letter from Fromer Eye Centers dated 02-26-18.

Exhibit 37
> Attached as "Exhibit 37" is a true and correct copy of the plaintiff's psychiatric evaluation by Queens Hospital Center dated 05-03-18. *Modified to comply Fe d. R. Civ. P. 5.2*

Exhibit 38
> Attached as "Exhibit 38" is a true and correct copy of the plaintiff's pre operative patient instructions by Long Island Jewish Forest Hills Hospital dated 04-26-18.

Exhibit 39

Attached as "Exhibit 39" is a true and correct copy of the plaintiff's psychiatric evaluation discharge by Elmhurst Hospital dated 05-25-18. *Modified to comply Fe d. R. Civ. P. 5.2*

Exhibit 40

Attached as "Exhibit 40" is a true and correct copy of correspondence between the plaintiff and alleged bipolar female stalker from several websites and spanning several dates, last on 01-06-18.

Exhibit 41

Attached as "Exhibit 41" is a true and correct copy of correspondence between the NYC Buildings Department Commissioners office and the plaintiffs business dated 04/13/18.

Exhibit 42

Attached as "Exhibit 42" is a true and correct copy of plaintiff's criminal charges in Queens County NY against a complaining witness Assistant District Attorney Brendan Quinones dated 06-01-18.

Exhibit 43

Attached as "Exhibit 43" is a true and correct copy of correspondence between the plaintiff employee and the district court, dated 07-17-18.

Exhibit 44

Attached as "Exhibit 44" is a true and correct copy of a NYC hospital admission band dated 08-18-18.

Exhibit 45

Attached as "Exhibit 45" is a true and correct copy of docket for claim 2:17-cv-1729.

Date:
September 10, 2018

**BY:**     Adil Khalil; Plaintiff *(Pro Se)*
158 Broadway
Shirley, N.Y. 11967

**TO:**     Honorary Joseph Bianco
100 Federal Plaza
Central Islip, N.Y. 11722

cc: Zachary W. Carter and David Cooper



**NEW YORK INSTITUTE OF TECHNOLOGY**

Z - 1

■ **Office of Student Affairs**

Tel 516 686 7635
Fax 516 686 7970

December 13, 2004

Mr. Adil Khalil
158 Broadway
Shirley, N.Y. 11967

Dear Mr. Khalil:

The following is a summary determination as rendered by the members of the Disciplinary Review Board hearing held on Thursday, December 9, 2004 in room 306.

Charges as outlined in my letter to you of November 23, 2004, Section (5) (C) (2) and (R) (1): The Disciplinary Review Board determined that you did not violate the Student Code of Conduct as charged.

Charges as outlined in my letter to you of December 3, 2004, Section (5) (E) (2) and Section (5) (F) (4): The Disciplinary Review Board determined that you did not violate the Student Code of Conduct as charged.

Therefore, all charges as outlined in my two letters have been dropped as it was the Board's determination that you did not violate the Student Code of Conduct.

Our prior arrangement in my letter of July 2, 2004 continues to remain in effect. You are still required to provide to me written documentation that you remain under continuous treatment of a psychiatrist/psychologist and it is my ongoing expectation that you provide me a bi-monthly written report from your psychiatrist/psychologist indicating that you remain under treatment and that your psychological functioning will continue to allow you to fully function in the college environment and that you do not present a danger to yourself or others.

My last point beyond the above requirement is that should you be involved in or be charged with any infraction of the Student Code of Conduct, immediate disciplinary action shall be initiated by my office.

I wish you success and it is my expectation that you see me with your letter not less than twice each month (with the exception of January break).

Sincerely,

James L. Ramert

James L. Ramert
Dean of Students



# NORTH SHORE UNIVERSITY HOSPITAL
## Forensic Psychiatry Program
### 400 Community Drive
### Manhasset, NY 11030
### (516) 562-3208

## Forensic Mental Health Evaluation

### CONFIDENTIAL INFORMATION

> Confidentiality: All parties were advised that the undersigned was working as a neutral evaluator in the above case. They were informed that the content of the interview and assessments would not be confidential, and that a written report would be submitted to the Dean James Rament of the New York Institute of Technology. All parties indicated their understanding of, and agreement with, the limits of confidentiality of these interviews and assessments.

**EVALUATORS:**　　　　Halana Rothbort, M.D.　　　**Psychiatrist**
　　　　　　　　　　　　Joe Scroppo, Ph.D., J.D.　　　**Psychologist**

**PARTY:**

　　　　Respondent:　　　　　　　　███████████
　　　　DOB:　　　　　　　　　　　███████
　　　　Age:　　　　　　　　　　　25
　　　　Dates of Interviews:　　　　12/27/06 and 3/6/06 (6 hours total)
　　　　Date of Psychological Testing:　02/13/06 and 02/14/06 (6 hours total)

**DATE OF REPORT:**　　　　　　4/10/06

## IDENTIFICATION AND ISSUE

████████████ began his studies at the New York Institute of Technology (NYIT) in September 1999 and presently wishes to continue to pursue a degree in architecture at NYIT. During his time at the college, there have been numerous allegations that ███████ repeatedly engaged in disruptive behavior, possibly damaged or destroyed school equipment, drove recklessly on campus, possibly destroyed the project of another student, and threatened the mental well being of a fellow student. These numerous allegations dating back to 11/7/01 have resulted in several formal disciplinary review board hearings, two suspensions, and an involuntary withdrawal from NYIT.

The New York Institute of Technology requests a forensic psychological evaluation of ██████ ██████ and any recommendations that may come as a result of the assessment. The evaluation should seek to determine:

1. Whether ████████ presents a danger to himself,
2. Whether ████████ presents a danger to others, and
3. Whether ████████ can function successfully in a college environment.

## SOURCES OF INFORMATION

1. Forensic interviews of the respondent party, ████████ by Halana Rothbort, M.D. at North Shore University Hospital.

2. Psychological testing of ████████ by Joe Scroppo, Ph.D., J.D., which consisted of: Minnesota Multiphasic Inventory (MMPI-2), Millon Clinical Multiaxial Inventory (MCMI-III), Brief Symptom Inventory (BSI), Substance Abuse Subtle Screening Inventory (SASSI-3), and Psychopathic Personality Inventory (PPI-R).

3. <u>Collateral Telephone Interview of M. Bhalla, CSW on 3/8/06 for 25 minutes.</u>

Mr. Bhalla stated that he is a social worker and is ████████ therapist. He stated that he is able to provide an unbiased assessment of ████████. He reported that he has seen the respondent for the past nine or ten months. He sees ████████ once or twice a month for individual therapy. Mr. Bhalla was asked to describe ████████ history of mental illness, paying particular attention to any prior self-injurious behavior, suicide attempts, violence, or psychosis. Mr. Bhalla reported that ████████ has no history of mental illness including no history of self-injurious behavior, suicide attempts, violence, or psychosis. Mr. Bhalla was asked his opinion as to the reasons for ████████'s continued difficulties at the New York Institute of Technology. He stated that ████████ has, "Some mild adjustment problem between his cultural inheritance and the college environment. He couldn't adjust to the college environment. He tried to adjust to it by going around like a hippy. He is conspicuous. He is immature. He reacts inappropriately toward other students secondary to his immaturity." Mr. Bhalla felt that the combination of ████████ physical appearance, immaturity, and difficulty adjusting resulted in teasing from other students. Mr. Bhalla believed that due to ████████ immaturity, he reacted inappropriately to this teasing. Mr. Bhalla was asked his opinion as to whether ████████ possesses insight into the reasons for his current difficulties. He answered, "████████ has partial insight." Mr. Bhalla was asked his opinion as to whether ████████ poses a danger to himself or others. Mr. Bhalla responded that, "████████ does not present a danger to himself or others." Mr. Bhalla was asked his opinion as to whether ████████ possesses the skills to cope with the present and future social, interpersonal and academic demands of the college environment. He answered that, "There is no reason why he should not be able to cope with the college environment." Mr. Bhalla was then asked his opinion as to what recommendations he would make to



Matter of █████
Page 3 of 17

assist ████ in his ability to function successfully in a college environment. He responded that, ████ is very receptive to therapy and discussing his issues. I feel he needs to continue in therapy to address his social interactions and general conduct in college."

4. <u>Collateral Telephone Interview of James Ramert, Dean of Students, Old Westbury, New York Institute of Technology, on 3/6/06 for 20 minutes.</u>

James Ramert stated that he is Dean of Students at the Old Westbury campus of the New York Institute of Technology. He reported that he knows ████ in his capacity as Dean of students. Dean Ramert was asked to give his opinion as to the reasons for ██ ████ current difficulties at school, both socially and academically. Dean Ramert answered that, "Everyone feels threatened by him. Faculty and peers are afraid of him, that he will burst out and harm someone." The Dean felt that ████ appearance, strange, and disruptive behavior engendered these feeling of fear. Specifically, Dean Ramert described that ████ at times wears a ski mask over his face, plays music loudly in the parking lot, and listens to loud music by headphones in class. He appears suspicious in his actions; walking aimlessly around the class, refusing to sit down when asked, spitting on the floor, and staring at others. In addition, it appeared to Dean Ramert that ████ has no friends at the New York Institute of Technology. Academically, the Dean reported that ████ has difficulty at times because he does not do the work that is assigned. "He can't follow the directions of the course work." Dean Ramert was then asked his opinion as to why ████ did not transfer to another university, in view of the significant and longstanding difficulties that he is experiencing. He answered that although his credits would transfer, he would have to make up many design courses, which would take a significant amount of time.

5. <u>Collateral Telephone Interview of Nicholas Defelice, M.A., Professor of Engineering at New York Institute of Technology, on 3/13/06 for 15 minutes.</u>

Professor Defelice reported that ████ was a student in his class in the fall of 2005. Mr. Defelice was asked to describe ████ behavior in his classroom. He stated that, "He would occasionally leave the room during lecture and return. He sat in the back of the room and I occasionally heard him talking to himself. It was strange. When asking a question, he would jump from one topic to another." Professor Defelice was asked to describe ████ interactions with others. He reported that, "Other students were generally leery of his behavior and would whisper to each other. But he did talk to peers or friends in class. He worked fine in a group for his class project." Professor Defelice was asked to describe ████ academic performance in his class. He stated that ████ did fine academically. Finally, he was asked his opinion as to whether ████ possesses the skills to cope with the present and future social, interpersonal and academic demands of the college environment. Professor Defelice answered, "I believe that he has the skills to cope with the college environment because he was fine academically in my class and others."

6.  <u>Collateral Telephone Interview of Timothy Loughlin, Chairman of the Mathematics Department at New York Institute of Technology, on 3/6/06 for 20 minutes.</u>

Initially, Professor Loughlin had great difficulty recalling ████ He asked when ████ was a student in his class. He looked through his grade book, which went back several years, in order to jog his memory, but did not find ████ in the book. Finally, Professor Loughlin recalled attending a disciplinary hearing in the past regarding a student by that name. He was then able to recall a small amount of information about ████ Professor Loughlin reported that ████ was quiet and was not a problem in his class. He was not disruptive. Academically, Professor Loughlin recalled that ████ "did reasonably well."

7.  <u>Collateral Telephone Interview of Mr. ████ Rehman, father of ████ on 3/1/06 and 3/13/06 for a total of 50 minutes.</u>

Mr. Rehman was asked to describe his son's early history with regard to any behavior problems at home or school, and any academic or social difficulties as a child. He stated that ████ had no problems at home or school as a child. Mr. Rehman reported that ████ got along with his siblings and got "A's" in school. Mr. Rehman was asked to describe his son's history of mental illness, paying particular attention to any prior self-injurious behavior, suicide attempts, or violence. Mr. Rehman reported that his son has no history of mental illness, including no history of self-injurious behavior, suicide attempts, or violence. Mr. Rehman was asked what ████ does when he becomes angry. He reported that ████ yells and rarely kicks the table or chair when he is very angry. He emphasized that ████ does not hit or kick people, has never been in a fight, and does not threaten others. Mr. Rehman stated that his son has no current or past legal problems. He reported that ████ has never had any difficulties at work. When asked about substance use, Mr. Rehman reported that ████ rarely drinks alcohol and never gets drunk. Mr. Rehman was asked about his son's driving. He answered, "████ doesn't drive fast, but he used to when he first learned to drive. Then he got a number of tickets and now he drives all right." Mr. Rehman was asked his opinion as to the reasons for his son's continued difficulties at college. He answered that, "The way he looks, his appearance, his hair, he feels different from other people. The problem is that he had a fight with this fraternity. They ganged up on him and targeted him to hurt him. He became defensive, feeling that everyone was trying to hurt him. His reputation got ruined and they think something is wrong with him."

8.  <u>Collateral Telephone Interview of Adalberto J. Nunez, friend of ████, on 3/13/06 for 20 minutes.</u>

Mr. Nunez stated that he is a friend of ████. He reported that he met ████ at the New York Institute of Technology in 1998, and currently sees him at least once a month. Mr. Nunez was asked what he and ████ do when they get together. He answered that they go to a ball game or, "████ comes over and we just hang out." Mr. Nunez was asked to describe ████ behavior when he is angry. He reported that ████ usually paces back

and forth or goes outside for a smoke when he is angry. Mr. Nunez was asked several questions to assess ████ current or past history of violence. He stated that ████ has never gotten in a fight, been threatening, or violent. Mr. Nunez was asked his opinion as to the reasons for ████ continued difficulties at the New York Institute of Technology. He answered, "If you're not in a fraternity, you're an outcast. I was in Alpha Cayro. We tried to rush him, but he didn't want to be a part of it. But we became friends anyway. The TKEs didn't like him because he's a little eccentric and an outcast. He looks a little awkward. They thought he liked one of the girls. He had a lot of friends there. People saw him as a loner after we (his friends) left. Then people started picking on him. They're very immature." In addition to ████ social difficulties at school, Mr. Nunez was asked his opinion as to the reasons for ████ significant academic and administrative problems while at the New York Institute of Technology. Mr. Nunez answered, "A lot of the staff at the school used to be in TKE so they take care of the students who are in TKE. People in the fraternity can get away with drinking and other things. There is no right or wrong in architecture so if the professor doesn't like you, he'll give you whatever grade he thinks you deserve." Finally, he was asked his opinion as to whether ████ possesses the skills to cope with the present and future social, interpersonal and academic demands of the college environment. Mr. Nunez responded that, "████ is bright and competent. He can definitely function at NYIT."

9. <u>Attempted Collateral Contact with Mr. Cleveland Neil, friend of ████████</u>

The undersigned made an effort to telephone Mr. Neil on 3/13/06 and a message was left requesting that he contact the undersigned. Mr. Neil, however, did not respond to this attempt.

10. Review of the following documents pertaining to ████████

   a) Request for a forensic evaluation from James Ramert, Dean of Students, New York Institute of Technology, on 2/9/06.

   b) Letter to ████████ informing him of his Interim Involuntary Withdrawal from James Ramert, Dean of Students Old Westbury, dated 2/8/06.

   c) An e-mail from Frank Genese regarding ████████ dated 2/7/06.

   d) An e-mail from Frank Genese regarding ████████ to James Ramert and Judy DiMaio, dated 2/7/06.

   e) An e-mail from Judith DiMaio regarding ████████ to James Ramert, dated 2/7/06.

   f) An e-mail from Diane Neff regarding ████████ to Judith Dimaio, Denis H. Mcguckin, and James Ramert, dated 2/6/06.

Matter of ████████
Page 6 of 17

g) An e-mail from Melissa Sciscioli, student, regarding ████████ to James Ramert, dated 12/7/04.

h) Letter to Mr. ████████ informing him that a formal Disciplinary Review Board hearing would be held, from James Ramert, dated 12/3/04.

i) Letter to ████████ informing him of allegations and charges against him and that he is being charged with violation of the NYIT Student Code of Conduct, from James Ramert, dated 11/23/04.

j) An e-mail from Professor Yelena Ilkanayev regarding ████████ to James Ramert, dated 11/23/04.

k) An e-mail from Jeffrey S. Morosoff, Director of Alumni and Government Relations, regarding ████████ to James Ramert, dated 9/29/04.

l) Letter to ████████ informing him of his suspension from NYIT from 9/2/2003 to 9/2/04 from James Ramert, dated 8/28/03.

m) Letter to Mr. Anjum ████ regarding his son's pending suspension from James Ramert, dated 8/20/03.

n) Letter to ████████ regarding the guidelines upon which his return to NYIT would be contingent, from Alice Heron-Burke, Director of NYIT Counseling Office, dated 8/27/02.

o) Letter to ████████ informing him of his suspension for the Spring 2002 semester, from Alice Burke, Director of Counseling, Harriet Kulka, Dean of Students, C.I., Sheryl Moody, General Counsel, and Mr. Thomas, Dean of Students, N.Y., dated 2/4/02.

p) Psychological evaluation of ████████ by Joseph G. Perino, Ph.D., dated 1/30/02.

q) Letter to ████████ formally notifying him of the outcome of his disciplinary meeting with the Central Islip Disciplinary Review Board, from Mark P. Carpenter, Acting Chair, Central Islip Disciplinary Review Board, dated 12/6/01.

r) An e-mail from Alexandra L. Stein detailing her experience with ████████ to Dean Harriet Kulka, dated 11/7/01.

s) Incident Report regarding Theft from Teri Nonan to Site Supervisor Anthony Guzzo, dated 8/15/03.

t) Stony Brook Emergency Department Psychiatric Assessment, dated 2/7/06.

u) New York Institute of Technology Academic Evaluation for ████████ dated 2/13/06.

v) New York Institute of Technology Transcript for ████████ dated 2/13/06.

w) Complete Medical Record of ████████ from the Suffolk County Department of Health Services Marilyn Shellabarger South Brookhaven Health Center East, dated 2/16/06.

## CLINICAL INTERVIEW / PERSONAL HISTORY – ████████

### Reliability Of Informant

████████ displayed sufficient cognitive and communicative abilities to allow him to participate fully in this interview. ████████ appeared eager to participate in the evaluation in order to return to school as quickly as possible. He responded promptly to all telephone calls and arrived early for both appointments. He was largely compliant and cooperative with the interview process. He was able to construct a logical and organized account of his history. However, his answers were often concrete and he appeared to have difficulty providing a logical account of the reasons for his current problems. When asked to discuss the allegations against him, his answers appeared insufficient and inaccurate. At times, his answers were internally inconsistent in that he altered them during the course of the evaluation. ████████ appeared defensive and evidenced a desire to present himself in the most desirable light, as do many respondents in a similar position. Consequently, ████████ overall account was deemed to be of limited to fair reliability.

### Living Arrangements and Means of Support

████████ reported that he lives with his parents in their home in Shirley, NY. He stated that he has lived there since age five, with the exception of one year from 2000 to 2001 when he lived in the dormitory at the New York Institute of Technology. ████████ reported that he works for "██ drafting", his own company. He creates structural designs and floor plans. He receives work from Elkin Architecture. He reported that he works Monday through Friday from 9am to 5pm and on Saturdays for two hours. He said that he earns $600 a week and that he pays some of his own bills. Specifically, he reported that his parents provide for his rent, food, gas, and electric, and pay for his car insurance and tuition. He pays for his gas, textbooks, clothing, computer programs, and food outside the house. He reported that he is currently "breaking even" financially but does have some debts for gas, books, and computer programs in the past.

Matter of ████
Page 8 of 17

## Social History

████ reported that he was born in Queens. At the age of five, he moved with his family to his current home in Shirley, NY. He reported that his parents are married. His father, ████ Rehman, is 54 years old and works as a journalist. His mother, Mrs. Anjum ████ is a homemaker and helps his father edit. ████ reported that he gets along with his parents, but does not confide in them. ████ is the second of four children. His oldest brother, ████ age 27, works with his father running an Urdu newspaper. ████ is also a student at Hofstra University. ████ lives with his girlfriend in Queens. ████ younger brother, Adam, is 22 years old and is studying business at St. John's University. Adam also works as a manager at "The Children's Place" and lives in an apartment in Jamaica. ████'s twin sisters, ████ age 21, also live in the apartment in Jamaica. ████ is studying biology at SUNY Old Westbury and working at a hospital. ████ is studying accounting at Hofstra University and working at the YMCA. ████ reported that he gets along with his siblings, but spends little time with them. He described being closest to his oldest brother, who is teaching him guitar.

████ reported that he has three close friends; Joel, Cleveland, and Jason. He reported that he is closest with Joel and confides in him. ████ enjoys playing ice hockey, roller hockey, reading and playing guitar. ████ reported that he does not have a girlfriend currently. He recalled that when he was 21 years old he had a girlfriend named "Gina" for about a year, but has had no relationships since.

████ reported that two years ago he began the slow process of becoming a Muslim. He stopped eating pork and drinking alcohol. He stated that he is still changing. "I still eat at Burger King." He explained that his mother is religious. He reported that his father is not religious, "but he believes in God. He made a pilgrimage to Mecca in 2001 and ████ ████."

## Education and Employment History

████ reported that he was in regular education throughout his education. He stated that his grades in elementary school and junior high school ranged from "satisfactory" to "excellent." ████ reported that he was an "A" student in high school. He stated that he "was friends with everyone in high school but was not in a clique." He denied any behavior problems throughout his education.

████ reported that his first job was from tenth to twelfth grade when he worked as a collator for Sunday Newsday. The summer after graduating High School, he worked for "Group Three Architect" in Manhattan. In his freshman year of college, he worked in a dormitory at the New York Institute of Technology as a desk manager. He reported that he signed people in and out of the building. This job ended when he moved out of the dormitory. The summer following his freshman year of college, he said that he worked for an architect called "Loreac Architects PC" in Scarsdale NY. He reported that this was a summer job. For the next year and a half, Mr. ████ reported working for a contractor named Andy Clifford doing renovations. For the past

year he has worked on his own and for Elkin Architecture. ████████ reported that his job is going well. He denied any difficulties at prior places of employment.

## Medical, Substance Abuse, and Legal History

████████ denied any past or current medical problems.
He reported that he stopped drinking alcohol two years ago, when he became a Muslim. Prior to that, he reported drinking "a few beers on the weekends." He admitted to smoking marijuana approximately twice a month with friends. He denied any other drug use.

████████ reported that prior to 2001, he received six or seven speeding tickets. He accrued 18 points on his license and had his license suspended in 2001. He subsequently earned his license back. ████████ denied any other legal problems.

## Family History

████████ denied any family history of mental illness.

## Psychiatric/ Psychological History

████████ reported that in 2001, the New York Institute of Technology said that he could not return to school unless he had a psychiatric evaluation. He went to the Stony Brook University Hospital Emergency Room for a psychiatric evaluation. ████████ reported that the psychiatrist in the emergency room said that he was paranoid and prescribed Risperdal. The doctor referred him to outpatient follow-up at South Brookhaven Medical Center. ████████ reported that there he saw Dr. Goldstein. He said that Dr. Goldstein told him not to take the Risperdal. He reported that he saw Dr. Goldstein for two months, and then switched to a different doctor. From 2001 to 2003 ████████ reported that he saw Dr. Schweb. He stated that he saw Dr. Schweb twice a month for therapy. In 2003 Dr. Schweb moved to Pakistan.

████████ reported that he is currently in treatment with Dr. Bhalla. He stated that he sees Dr. Bhalla twice a month for the past two years. He reported that his sessions range in duration from 30 minutes to 90 minutes. ████████ was asked what he talks about in therapy. He answered, "We talk about why people take advantage of me and what I need to do to not be conspicuous. He thinks I'm giving off the wrong impression. He thinks my problems are because I don't fit in. It's cultural, I'm not adapting to the American way of living. He thinks I need to act more American to fit in. He insists I have to be more like them. He wants me to cut my hair. He blames my problems on my hair. He reprimands me. He's a rough guy. He helps me to take responsibility for my actions." ████████ was asked why he goes to therapy. He answered that, "I go to therapy because the school requires me to, otherwise I would not. I don't think I have such issues. It's simple." ████████ was asked if he believes that he has benefited from the therapy. He stated, "I think the therapy is helpful because it helps me think about things I wouldn't otherwise think about." ████████ was asked if he would go to a different therapist or

psychiatrist if the school requested it. He answered that he would do whatever the school required him to do.

████████ denied any current or prior symptoms of depression, mania, psychosis, anxiety, obsessions, compulsions, panic attacks, or eating disorder. He denied current or prior suicidal or homicidal ideation, intent, plan, or behavior. ████████ denied any history of violence. He denied any history of trauma or abuse. ████████ denied any history of psychiatric hospitalizations or medications.

## ACCOUNT OF INSTANT MATTER

Please be advised that the instant matters are very briefly summarized in the accounts below. The reader is referred to documents "b" through "s" for more details.

On December 6, 2001 the Central Islip Disciplinary Review Board found ████████ responsible for violating the Student Code of Conduct by threatening the mental well being of a fellow student. When this examiner discussed the specific allegations with ████████ he responded by denying them. He answered, "I didn't do it. She's lying. I never went there. I left early that day. It was a long time ago, I don't remember what happened." The answers provided by ████████ appeared insufficient and inaccurate.

On August 28, 2003 ████████ was suspended from attending classes at NYIT for the period of one year effective 9/2/03 to 9/2/04 for violating the terms of his probation. When ████████ was asked why he visited the Central Islip campus when he was a persona-non-grata, he replied that his probation had expired by then. Again, this superficial explanation appeared insufficient.

On November 22, 2004 it is alleged that ████████ walked into a class while it was in session and destroyed the sculpture project of another student. When ████████ was questioned in detail about this incident, he responded that, "The class was not in session and nobody was in the room." His response was very concrete and focused on the irrelevant details of the episode instead of the central issue of his potential destruction of another student's model. In addition, his account was at odds with available documentation. When further pressed by the evaluator, initially ████████ reported that he went to talk to a student in the class, looked at the model, and "put it down a little rough." However, later, he stated that he was walking through the class to get to his class, and that nobody was in the classroom. ████████ account of the matter was internally inconsistent and in that as he altered it during the course of the evaluation.

On February 8, 2006 ████████ was involuntarily withdrawn from NYIT on an interim basis due to (1) his failure to report the personal injury of his hand or the damaged equipment to security, (2) allegations that he may have been involved in the destruction of computer equipment, the theft of a plotter, and the damage to equipment, and (3) consistent disruptive behavior including listening to loud music in class, walking around during class, and allegedly smoking pot in the parking lot. ████████ was questioned about these allegations in great detail. ████████ explained that when he entered the room, one of the computers was already damaged. He reported that he accidentally cut his hand while working on his project. He admitted that he

did not clean up the blood or report the incident to security, "because my hand was bleeding. I left and went to the emergency room." He acknowledged that perhaps he should have reported the injury and cleaned up the blood. It appeared credible to the undersigned that the injury to ████████ hand was an accident rather than an intentional act of self-harm. According to all collateral sources, ████████ has no history of self-injurious behavior or suicide attempts. In addition, medical records from ████████ primary care physician support an accidental injury.

████████ denied that he had any involvement with damage or destruction of school equipment, or theft of school property. According to documentation, there does not appear to be any direct evidence that ████████ was responsible for the destroyed or missing property. As ████████ has no history of vandalism or theft, nor any history of legal problems, this answer appeared credible.

████████ denied the allegations of his consistent disruptive behavior. Initially, he stated, "I listen to my headphones in class. I don't think it's too loud. Other students do it too." This answer highlights ████████ immaturity. Later during the evaluation, ████████ said, "I was never disruptive in class. I listen to my headphones before and after class, not in class." Again, his account was self-contradictory in that he altered it during the course of the evaluation.

With regard to smoking pot in the parking lot, ████████ admitted that he engaged in this behavior approximately once or twice a month. In view of ████████ history at NYIT of numerous difficulties with administration regarding his behavior and conduct, his continued use of an illegal substance in a public place on campus highlights his poor judgment and lack of insight into the reasons for his continued difficulties.

## VIOLENCE RISK ASSESSMENT FACTORS

N.B.: These factors are taken from the <u>Assessing Risk for Violence</u> (HCR-20)- a risk assessment instrument that reviews 20 factors that have been identified in the research literature to correlate with the risk of violent offenses.

Major Risk Factors for Violence:

A. <u>Historical Items</u>    Code 0= No/Absent, 1= Partially/possibly present, 2= Yes/Present

| | |
|---|---|
| 1. Previous Violence | 0 |
| 2. Young Age at First Violent Incident | 0 |
| 3. Relationship Instability | 0 |
| 4. Employment Problems | 0 |
| 5. Substance Use Problems | 2 |
| 6. Major Mental Illness | 1 |
| 7. Psychopathy | 0 |
| 8. Early Maladjustment | 0 |
| 9. Personality Disorder | 2 |
| 10. Prior Supervision Failure | 0 |

B. Clinical Items

| | | |
|---|---|---|
| 11. | Lack of Insight | 2 |
| 12. | Negative Attitudes | 0 |
| 13. | Active Symptoms of Major Mental Illness | 0 |
| 14. | Impulsivity | 0 |
| 15. | Unresponsive to Treatment | 0 |

C. Risk Management Items

| | | |
|---|---|---|
| 16. | Plans Lack Feasibility | 0 |
| 17. | Exposure to Destabilizers | 2 |
| 18. | Lack of Personal Support | 0 |
| 19. | Noncompliance with Remediation Attempts | 0 |
| 20. | Stress | 2 |

These factors give some sense of a person's risk for violence. They do not, however, combine to a partial score or risk estimate and must be evaluated in the context of all the information available to the evaluators.

## RESULTS OF PSYCHOLOGICAL TESTING—████████

The following psychological tests were administered to ████████

1.   Minnesota Multiphasic Inventory (MMPI-2)
2.   Millon Clinical Multiaxial Inventory (MCMI-III)
3.   Brief Symptom Inventory (BSI)
4.   Substance Abuse Subtle Screening Inventory (SASSI-3)
5.   Psychopathic Personality Inventory (PPI-R)

Behavior Observations

████████ denied any physical symptoms or cognitive impairment that might interfere with the testing. His displayed adequate effort and engagement with the testing tasks.

The psychological test interpretations presented in this report are hypotheses and should not be considered in isolation from other information in this report. The interpretive statements are actuarial and expert predictions based upon the results of a larger sample. These measures reflect characteristics of people who have provided similar test response patterns and are important because they might reflect personality features that are related to psychological functioning; they do not, however, necessarily directly reflect the respondent's behavior. In the integration and presentation of test results, when results are unclear or in conflict, clinical judgment is used to choose the most likely hypothesis for presentation.



████ was administered the MMPI-2, an objective personality test that assesses the presence of major symptoms of social and personal maladjustment. ████ produced a profile of marginal validity. He responded in a highly defensive manner and failed to acknowledge even minor everyday problems. Such a response style is found among persons who are consciously minimizing their problems, who lack psychological sophistication, or who have a rigid personality. ████ protocol did not feature any clinical elevations.

████ was administered the Millon Clinical Multiaxial Inventory-III (MCMI-III), an objective test designed to assess the presence of DSM-IV-related clinical and personality disorders. ████ produced a highly defensive test profile that indicated that he was unwilling or unable to acknowledge even minor negative flaws. Given the highly defensive nature of the profile, no further conclusions could be derived from ████ MCMI-III.

████ was administered the Substance Abuse Subtle Screening Inventory (SASSI-3), a test that assesses the probability that an individual has or has had a substance dependence disorder. He produced a valid protocol that indicated that there was a low probability that he has or has had a substance dependence disorder.

████ was administered the Psychopathic Personality Inventory (PPI-R), a 154-item self-report measure of both global psychopathy and the component traits of psychopathy. ████ produced an extremely defensive protocol. ████ profile was not consistent with that of psychopathic person, but this conclusion must be tempered by his unwillingness to disclose negative information about himself.

████ was administered the Brief Symptom Inventory (BSI), a 53-item self-report scale used to measure nine primary symptom dimensions (somatization, obsessive-compulsive behavior, interpersonal sensitivity, depression, anxiety, hostility, phobic anxiety, paranoid ideation, and psychoticism), and three global indices. ████ profile did not reveal any significant symptomatology.

## MENTAL STATUS EXAMINATION

████ is a 25-year-old male of Middle Eastern decent who appeared his stated age. He is of average height and weight. He had a large mole on his cheek. He had long hair and a beard, and appeared slightly unkempt. He was casually dressed. His eye contact was poor. Often, he appeared to stare at the corner of the ceiling or floor, or look directly away from the examiner in a fixed stare that would last a few seconds. When ████ was questioned about these episodes of staring, he answered, "Oh, I was just thinking." ████ was cooperative with the interview, and at often appeared overly eager to please the examiner. There was mild psychomotor agitation in that he frequently shifted in his chair. Speech was increased in rate, but normal in rhythm and volume. He reported that his mood was "good" and he appeared anxious. His affect was blunted. ████ denied current or prior suicidal or homicidal ideation, intent, plan, or behavior. He denied any prior self-injurious behavior, suicide attempts, or episodes of violence. His thought processes were logical and goal directed. Though content was focused on the questions asked. His thought perception was negative for hallucinations or delusions. ██

████ was alert and oriented to person, place, and time.  His short-term memory was good with recall of three out of three words after five minutes.  He had significant difficulty with calculations.  When asked to subtract 7 from 100 and continue to subtract 7 from the number that you get, he answered, "93, 84, 73, 64."  His concentration and attention were impaired as assessed by his inability to spell the word "WORLD" backwards.  ██████ was able to interpret proverbs.  His insight and judgment were impaired.  Impulse control was good during evaluations.

## DIAGNOSTIC IMPRESSION

Axis I:         309.3   Adjustment Disorder with disturbance of conduct

Axis II:        301.9   Personality Disorder Not Otherwise Specified with Schizotypal and
                Paranoid features.

Axis III:       None

Axis IV:        Educational Problems, Problems related to the social environment.

Axis V:         50

## CONCLUSIONS

At times, ██████ provided insufficient or inaccurate answers to questions.  At other times his accounts were internally inconsistent and at odds with available documentation.  Partially, his impaired compliance appeared to be due to anxiety and a desire to present himself in the best possible light, as is common of many respondents in a similar situation.  However, at other times, he appeared to be withholding or providing inaccurate information in an attempt to manipulate perceptions about himself.  These factors rendered his account to be of limited to fair reliability.

According to all sources, including the respondent, collateral contacts, and available documentation, ██████ has no current or prior history of self-injurious behavior or suicidal ideation, intent, plan, or behavior.  As a result, he does not appear to be a danger to himself at this time.

Based on a comprehensive risk assessment, ██████ poses a low risk to society of violence.  Numerous factors that correlate with the risk of violence are absent in ██████ history.  Specifically, ██████ has no history of previous violence, early maladjustment, psychopathy, active symptoms of major mental illness, past treatment or supervision failures, relationship instability, or employment problems.  Furthermore, ██████ does not appear to possess antisocial attitudes toward others, institutions, or the law.  He does not appear callous or to lack empathy.  In fact, overall, ██████ appears to possess a feasible plan and an optimistic view of the future.  ██████ possesses few factors that correlate with the risk of violence.  These factors are his use of marijuana and his lack of insight into the reasons for his current difficulties.

Therefore, based on our comprehensive risk assessment, it is our opinion that ███████ does not pose a danger to others at this time.

The final question that the New York Institute of Technology seeks to answer of whether ███████ ███████ can function successfully in a college environment is more complex. First, psychiatric training and expertise does not directly bear on this question. Second, the answer is dependent on the specific college environment, the specific demands of that environment, and the abilities and difficulties that the specific individual brings to the environment. Nevertheless, psychiatric issues may indirectly bear on the general competencies necessary to function in a college environment. In our opinion, the general competencies necessary to function in a college environment include, but are not limited to:

1) The ability to follow basic rules,

2) The ability to conduct oneself in a manner that does not interfere with the well being or learning of others,

3) Basic interpersonal skills,

4) The ability to perform activities of daily living independently,

5) Basic organizational skills, and

6) Integrity.

It appears that ███████ has had repeated difficulty with several of these basic competencies. Specifically, ███████ inability to follow a basic rule is exemplified by his admission that he smokes marijuana in a parking lot on campus once or twice a month. Another potential example of his difficulty following a basic rule is evident when ███████ allegedly violated the terms of his probation by visiting the Central Islip campus when he was a "persona non-grata." Still another example of the respondent's difficulty following basic rules is the allegation of his driving recklessly on campus. It appeared that ███████ likely had difficulty driving responsibly on campus due to the combination of (1) documents allegedly witnessing his reckless driving, (2) his father's admission that he got a number of tickets, and (3) his own admission that he received seven or eight speeding tickets and had his license revoked in 2001. Unfortunately, ███████ showed poor insight into his difficulty following basic rules.

In addition to ███████ repeated difficulty following basic rules, he also exhibited trouble conducting himself in a manner that does not interfere with the well being or learning of others. In December 2001, ███████ was found responsible for threatening the mental well being of a fellow student. In November 2004, ███████ was accused of destroying the sculpture project of another student. While ███████ denied both of these allegations, he admitted to listening to music in class. Supporting documents view his listening to music during class as disruptive to others. Thus, ███████ has exhibited repeated difficulty conducting himself in a manner that

Matter of ███████
Page 16 of 17

does not interfere with the well being or learning of others. Again, ███████ possessed little insight into his impaired conduct.

Due to conflicting reports, it remains unclear whether ███████ possesses the basic interpersonal skills necessary to function at NYIT. According to ███████ he is friendly and is able to get along with faculty and peers. According to Dean Ramert, "Everyone feels threatened by him. Faculty and peers are afraid of him…" According to Professor Defilice, "Other students are generally leery of his behavior, but he did talk to peers or friends in class, and he worked fine in a group." Other collateral contacts are equally divided on ███████ basic interpersonal skills.

It appears that ███████ is able to independently perform activities of daily living (ADLs) necessary to function in a college environment. These ADLs include bathing and washing clothing in order to maintain a minimally adequate degree of personal hygiene. In addition, ███████ is able to provide for his own nutritional needs.

While ███████ grades are inconsistent, he appears to possess adequate organizational skills to function in a college environment.

Finally, integrity is necessary to function in a college environment in order to prevent lying, or cheating on tests or projects, and stealing from others. According to documentation, there does not appear to be any direct evidence that ███████ was responsible for the destruction or theft of property. ███████ has no history of vandalism or theft, nor any history of legal problems. Therefore, ███████ does appear to possess the minimal amount of integrity to function successfully in a college environment.

In summary, while ███████ appears to possess the basic integrity, organizational skills, and ability to independently perform activities of daily living, and may possess the basic interpersonal skills to function in a college environment, he has evidenced repeated difficulty following basic rules and conducting himself in a manner that does not interfere with the well being or learning of others. Furthermore, ███████ exhibited little insight into his difficulties.

## RECOMMENDATIONS

After careful consideration of the complex elements in this case, the following suggestions are respectfully submitted for consideration.

1. In view of ███████ Adjustment disorder with disturbance of conduct and personality disorder not otherwise specified, with recurrent difficulties at NYIT and poor insight into the reasons for his problems, the respondent would benefit from ongoing, consistent, psychiatric treatment with a licensed, skilled, and experienced psychologist. The treatment should focus on maximizing his functioning and improving ███████ insight into his difficulties.

2. In arriving at a decision regarding ███████ future at the New York Institute of Technology, the Review Committee should consider that,

Matter of ██████████

Page 17 of 17

A.  ██████████ does not appear to be a danger to himself at this time.

B.  Based on our comprehensive risk assessment, ██████████ does not pose a danger to others at this time.

C.  ██████████ has evidenced repeated difficulty following basic rules and conducting himself in a manner that does not interfere with the well being or learning of others. Furthermore, ██████████ exhibited little insight into his difficulties.


_Halana Rothbort_ MD

Halana Rothbort, M.D.
Psychiatrist


_Joe Scroppo_

Joe Scroppo, Ph.D., J.D.
Director
Forensic Psychiatry Program



Pratt Institute

**THE INSTITUTE    THE WORK    ACADEMICS    ADMISSIONS    STUDENT LIFE    A**

# CAMPUS DIRECTORY

**HOME / THE INSTITUTE / CAMPUS DIRECTORY**

# NICHOLAS AGNETA



Adjunct Associate Professor
Undergraduate Architecture
nagneta@pratt.edu
(718) 399-4305 p
(718) 399-4332 f
Brooklyn Campus, Higgins Hall North 1ST FL

**CURRENT COURSE LISTING (8)**

18/FA-ARCH-363-03 Professional Practice

18/FA-ARCH-363-03 Professional Practice

18/FA-ARCH-9401-01 Undergraduate 1-Credit Internship

18/FA-ARCH-9402-01 Undergraduate 2-CREDIT Internship

18/FA-ARCH-9403-01 Undergraduate 3-CREDIT Internship

18/FA-ARCH-960B-01 Graduate Architecture Internship

18/FA-ARCH-960C-01 Graduate Architecture Internship

18/FA-ARCH-960D-01 Graduate Architecture Internship

**PERSONAL URL**

nicholas-agneta.com

THE INSTITUTE     THE WORK     ACADEMICS     ADMISSIONS     STUDENT LIFE     A

**EDUCATION**

B. Arch., The Cooper Union.

**BIOGRAPHY**

Achieved licensure with New York State in 1986; architect and construction manager in the New York City metropolitan area; has taught at New York University and New York Institute of Technology; currently teaching Professional Practice and is IDP Coordinator at Pratt.

---

Campus Directory

    **Pratt Offices**

    **Campus Directory Faculty and Staff**

# PRATT INSTITUTE

**BROOKLYN CAMPUS**          **MANHATTAN CAMPUS**
**200 Willoughby Avenue**     **144 West 14th Street**
**Brooklyn, NY 11205**        **New York, NY 10011**
**718.636.3600**              **718.636.3600**
**Directions**               **Directions**
**Contact Us**

Pratt Institute                                                    Page 3 of 3

Visit Us

**QUICKLINKS**

TAKE OUR VIRTUAL TOUR THE WORK     ACADEMICS     ADMISSIONS     STUDENT LIFE     A
Academic Calendar

Accessibility

Apply Now

Faculty and Staff Directory

Hire Pratt Talent

Learning/Access Center

Online Bookstore

Libraries

Privacy Policy

Work at Pratt

**PRATTMWP**

310 Genesee Street
Utica, NY 13502
800.755.8920

**PRATT WEBSPACE**

ePortfolio

Intranet

LMS

myPratt

Policies

Pratt Commons

Talks.Pratt





**Pratt** Institute School of Architecture
CURRICULUM DESCRIPTION

Undergraduate Architecture Program
Degree Project *Research* : Fall 2010

| Arch 484 | DEGREE PROJECT *RESEARCH* |
|---|---|

| Fall 2010 | |
|---|---|
| Credits | 3 |
| Type | Required Seminar [ Prerequisite to Arch 485 ] |
| Schedule | Tuesdays, 9:30am – 12:30pm, 31 Aug. 2010 – 14 Dec. 2010 |
| Prerequisites | Arch 400 or equivalent, with grade of "C" or above |
| Enrollment Limit | 16 students per section |
| Sections / Instructors / Locations | |

| | | | |
|---|---|---|---|
| .01 / .02 | Chris Perry / Michael W. Su [ Coordinator ] | HHS | 112 |
| .03 / .04 | Michael Chen / Jason Lee | HHS | 215 |
| .05 / .06 | Yael Erel / Eric Wong | HHS | 513 |
| .07 / .08 | Deborah Gans / Jeremie Carvalho | HHS | 512 |
| .09 / .10 | Mark Rakatansky / Aaron White | HHN | 308 |
| .11 / .12 | Ran Oron / Anthony Titus | HHN | 109 |

| Calendar | | | |
|---|---|---|---|
| 30 Aug. | Classes begin | 23 Nov. | Draft Proposals DUE |
| 31 Aug. | DP Sec. Sel. + Q/A  09:30 - 12:30 | 24 Nov. | Thanksgiving Break begins |
| 21 Sept. | Initial Research Presentations | 30 Nov. | Last Class!!! |
| 19 Oct. | Pre-Midterm Reviews | 07 Dec. | Proposal Feedback DUE |
| 26 Oct. | Midterm Break : No Class! | 14, 15 Dec. | **FINAL REVIEWs** [TBD] |
| 02 Nov. | **MIDTERM REVIEWs** | 17 Dec. | Final Proposals DUE  [Friday] |

## OVERVIEW

At the Pratt Institute School of Architecture, the fifth year of undergraduate studies is distinguished by the requirement for students to ~~independently articulate an explicit critical architectural position~~. The vehicle for this articulation is the Degree Project.

Degree Project consists of Degree Project *Research* (Arch 484) in the Fall 2010 semester and Degree Project *Studio* (Arch 485) in the Spring 2011 semester. The *Research* semester is dedicated to the exploration and identification of specific avenues of architectural inquiry, while the *Studio* semester is devoted to the conceptualization and development of an architectural project – a "Degree Project," which expresses or embodies a well-defined position. Together, *Research* and *Studio* require students to think critically, take risks, and adapt themselves to novel tools, techniques, and modes of representation, while ~~equipping them,~~ ultimately, with the means to address issues ranging from the specifically architectural, ~~such as architectural,~~ ~~formal, programmatic, tectonic, and representational,~~ to the most general, *e.g.* – ~~social, political, cultural, technological, and ecological.~~

Degree Project *Research*: Over the course of the 15-week, Fall semester, students will explore possible domains of architectural investigation through weekly seminars, writing/design assignments, and juried presentations. In particular, students will undertake research exercises, produce drawings and models, and write essays ranging from the speculative or interpretive, to the critical. This exploration culminates in the production of a DEGREE PROJECT PROPOSAL consisting of selections of the student's work during the semester and, crucially, the explicit articulation of a ~~THESIS STATEMENT~~ – a ~~concise statement~~ ~~identifying the specific architectural inquiry and design stance the student will pursue.~~ This DEGREE PROJECT PROPOSAL sets the stage for the following, *Studio* semester.

Arch 484

18

Degree Project *Research* : Fall 2010

---

**EDUCATIONAL OBJECTIVES**
This course fulfills the following NAAB requirements:

| | |
|---|---|
| Speaking and Writing Skills (1) | Ability to read, write, listen, and speak effectively. |
| Critical Thinking Skills (2) | Ability to raise clear and precise questions, use abstract ideas to interpret information, consider diverse points of view, reach well-reasoned conclusions, and test them against relevant criteria and standards. |
| Research Skills (4) | Ability to gather, assess, record, and apply relevant information in architectural coursework. |
| Use of Precedents (11) | Ability to incorporate relevant precedents into architecture and urban design projects. |
| Program Preparation (16) | Ability to prepare a comprehensive program for an architectural project, including assessment of client and user needs, a critical review of appropriate precedents, an inventory of space and equipment requirements, an analysis of site conditions, a review of the relevant laws and standards and assessment of their implication for the project, and a definition of site selection and design assessment criteria. |

---

## STRUCTURE

The organizational structure of Degree Project *Research* is characterized by the following four components:

### 1. DIRECTED RESEARCH

As a point of departure, Section Instructors direct their section's research by prescribing both the *Research Theme* or *Topic*, and the associated *Material Practice*. Although individual sections may be structured somewhat differently, the Fall 2010 semester generally consists of the completion of research assignments and exercises related to the section's *Theme/Topic* and *Practice*. These exercises are intended to facilitate the individual development or refinement of the architectural concepts, tools, and methodologies necessary for the identification of particular interests. That is, the *Theme/Topic* and *Practice* of each section merely comprises a pedagogical foundation upon which students may better identify and pursue their individual interests in the course of articulating an explicit, critical architectural position. [ To aid students in identifying the research section most suited to their existing interests, the syllabi for each section will have been distributed to all students in advance of the Degree Project Section Selection. ]

---

NB: For the Fall 2010 semester, the *Research Theme/Topic* and *Material Practice* of each section will be presented by Section Instructors at the Degree Project Section Selection on 31 Aug. at 09:30 in HHS 416. Subsequent to these presentations, Section Instructors will host Question/ Answer sessions in their respective seminar rooms until 12:30. All section selections must be made on the official Section Selection Form.

**Completed forms are due on 1 Sept. at 13:00 in the UG office.**

---

For the Fall 2010 semester, the six section *Research Themes/Topics* are:

| Section | Instructors | Themes/Topics [*may not be final*] |
|---|---|---|
| .01/.02 | C. Perry / M. Su | SensoryARCHITECTURE : Architecture and Mobility |
| .03/.04 | M. Chen / J. Lee | Crisis Fronts : Cognitive Infrastructures |
| .05/.06 | Y. Erel / E. Wong | matter / anti-matter |
| .07/.08 | D. Gans / J. Carvalho | HOT HOUSE : Horticultural Tectonics |
| .09/.10 | M. Rakatansky / A. White | Architectural Parametrics |
| .11/.12 | | |

Section Instructors will assign an introductory research exercise prior to the first section meeting on 7 Sept. The findings of this exercise is scheduled for review at the Initial Research Presentations on 21 Sept. Subsequent to this review, Section Instructors will assign further, specific research assignments and exercises, which will serve to assist students on the identification and development of their interests and the eventual production of their DEGREE PROJECT PROPOSALS.

Arch 484                                                                                                    2.8

Degree Project *Research* : Fall 2010

## 2. TEAM TEACHING

Each section of Degree Project *Research* is led by two instructors. In addition to making available a wider range of experiences, processes, methods, and prospects than those of a lone mentor, the team-teaching approach fosters an environment of collaboration which, in turn, promotes an expansive discourse between students and additional educators-at-large. Essentially, the resultant dialogues instill students with the very independence, creativity, and maturity critical to the successful realization of a Degree Project.

## 3. DEGREE PROJECT ASSESSMENT COMMITTEE (DPAC)

In addition to the section instructors, students will access a changing roster of educators-at-large through the Degree Project Assessment Committee. This committee consists of faculty from the breadth of the school's curriculum, who not only participate in reviews, but also evaluate Degree Project Proposals. As such, responsibility for the academic assessment of students is divided between section instructors and committee members. For the Fall, 2010 semester, the DPAC includes the following faculty members: Undergraduate Acting Chair (Erika Hinrichs), Degree Project Coordinator (Michael W. Su), History/Theory Coordinator (Deborah Gans), Core Design Studio Coordinators, and the Language/Making Workshop Coordinator (Jeffrey Hogrefe).

## 4. DEGREE PROJECT "LANGUAGE / MAKING" WORKSHOP

Jeffrey Hogrefe, Coordinator of the Architecture Writing Program, organizes the Degree Project "Language/Making" workshops. Language/Making, a trans-disciplinary collaboration of the School of Architecture and School of Liberal Arts and Sciences, offers a program of cross-linked, integrated seminars, studios, and poetry workshops in the first year, and workshops and consultations in the fifth year. This program assists students with inventing the material and conceptual languages, which shape the articulation and presentation of design projects. Each Degree Project section is assisted by a dedicated Language/Making Instructor for assistance with, firstly, the conceptualization of projects and the articulation of the architectural THESIS STATEMENT and secondly, the production of the supporting DEGREE PROJECT PROPOSAL. The exact nature of this collaboration is left to the discretion of Section Instructors and Language/Making Instructors. At a minimum, Language/Making Instructors act in a supportive capacity for each section by consulting with Degree Project Section Instructors on the preparation of writing assignments, attending at least one of the research seminars, participating in the Midterm and Final Reviews, and meeting with students for four mandatory Authorship Workshops.

---

DEGREE PROJECT AUTHORSHIP WORKSHOPS             [ doubleoperative.wordpress.com ]

The Authorship Workshops introduce students to the grammar, syntax, and tectonics of a written project. Building upon the introduction to Language-Making practices, which students received in the first year, the fifth year workshops instruct students on the composition of spatial and material practices, programmatic frameworks, and fields of operation for the development and articulation of a *Degree Project*. Instruction is provided in the composition of a body of theory in a genealogy and in the reiteration of ideas and dispersal of knowledge in the linguistic devices that the language provides for space-making propositions: analogues, tropes, dialectics, concepts, logos and the formulation of aphorisms, titles, and thesis statements. The workshops look to literature, film, theory, criticism and philosophy as material with which to make and name space. Through mapping as a critical practice, students will learn to write into their design projects as if writing were drawing, *i.e.* – writing is clearer in the crafting of experiences. In particular, writing can delineate the performance of a body moving in space as it experiences the senses, so as to locate a critical, sensorial material practice and program.

For the Fall 2010 semester, four *mandatory* Authorship Workshops will be conducted on consecutive **Saturdays: Sept. 25, Oct. 2, Oct. 9, and Oct. 16, from 12:00 to 13:30, in 111 Higgins Hall.**

---

Degree Project *Research* : Fall 2010

## DEGREE PROJECT PROPOSAL

Degree Project *Research* mandates the guided completion of a body of assignments and exercises towards the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ With the counsel of Section and Language/ Making Instructors, students may be tasked with the creation of drawings and models, and the composition of essays and research documents – the sum of which inspires specific lines of inquiry, describes the actual research conducted during the semester, and conveys the conclusions of the investigation. Though divergent in form, these modes of work are weighted equally, as the adoption of a definitive stance requires not just varying modes of representation, but also concise, textual explication. In turn, a selective, personal compilation of the resultant drawings, models, and essays motivates the individual declaration of an architectural position, *i.e.* – ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Together, compilation and articulation comprise each student's DEGREE PROJECT PROPOSAL.

Although proposals may, at the discretion of section instructors, assume myriad formats, every Degree ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and conform to the following specifications:

‣ Minimum bound size is 6"w x 8"h; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
‣ On the outside front cover, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
‣ On the inside front cover, clearly state the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
‣ The first text of the booklet will be the THESIS STATEMENT.
‣ ALL quotations and images must be attributed ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. For reference, please examine: Strunk, William and White, E. B. *The Elements of Style*. Upper Saddle River, NJ: Pearson Longman, all editions. See also Hacker, Diana. *Rules for Writers*, New York: Bedford/St. Martin's, 2003.

In order to facilitate the equitable evaluation of proposals, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ the following six components:

### 1. THESIS STATEMENT [1 page]

The Degree Project Proposal begins with the THESIS STATEMENT – a one page text containing the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. This position should be delineated not only with respect to such architectural notions as site, program, and structure, but also to more general concepts such as society, politics, culture, technology, and ecology.

### 2. GENEALOGY [min. 3 pages]

The section on Genealogy traces the pervasive, interdisciplinary pollination of concepts and materials into architecture from disciplines ranging from the visual arts, literature, and science, to philosophy, history, and sociology. Specifically, this section identifies the issues and delineates the methodologies, either through analogy or parallelism, which have been incorporated into the Proposal. As such, this section renders distinct not just the laminar flows, but the turbulent disruptions of myriad paths and processes comprising the conceptualization of the Thesis Statement. With respect to both the introductory research exercise and other components of the Proposal, this section corresponds to a historiography of the *Research Theme/Topic*.

### 3. MATERIAL [min. 3 pages]

The section on Material identifies the specific *Material Practice* of the Thesis Statement. This section provides detailed answers to the following general inquiries:

Which material practices are invoked by the proposition of the Thesis Statement?
How do the resultant practices translate into actual architectural production?

Degree Project *Research* : Fall 2010

**4. PROGRAM [min. 3 pages]**
The section on Program describes the architectural Program – whether concrete, speculative, or abstract – specifically associated with the Thesis Statement. An architectural Thesis is, fundamentally, an explicit assertion of certain relationships between *object* and *subject, i.e.* – the Thesis stipulates a method of "interface". As such, the proposition of a Thesis Statement embodies its testability by the example of a particular program. This Program may be delineated by:
1) Exemplar of precedence, *i.e.* – existing models or types.
2) Innovation of composition, *i.e.* – combinations of existing models or types.
3) Novelty, *i.e.* – categorical absence of examples.

**5. SITE [min. 2 pages]**
The section on Site concretizes the Genealogy, Material, and Program of the Thesis Statement by designating an actual, physical location at which the Thesis statement may be realized. Indeed, this designation constitutes the literal grounding of a Thesis Statement, which renders the Thesis realizable as an architectural project. Besides maps and drawings, the designation of Site may consist of graphical studies of figure/ground relationships, program development charts, or extended bibliographies of site characteristics, history, and readings.

**6. ANNOTATED BIBLIOGRAPHY**
The section on Bibliography identifies at least five sources, which stimulated the semester's research and, hence, influenced the conception of the Thesis Statement. This section should therefore consist of descriptions of each source and elaborations of its impact upon the articulation of the Thesis Statement.

## COURSE REQUIREMENTS
1. Consistent attendance and participation in weekly seminars and, if applicable, timely and satisfactory completion of weekly assignments. Attendance and participation account for 20% of the final grade.

**Three unexcused absences result in a grade of F for the course.**

2. Timely and satisfactory completion of the following course benchmarks during the Fall 2010 semester:
   ‣ 21 Sept.   Initial Research PRESENTATIONS
   ‣ 19 Oct.    PRE-Midterm REVIEW
   ‣ 02 Nov.    MIDTERM REVIEW
   ‣ 23 Nov.    *Draft* Degree Project Proposals DUE
   ‣ 14 Dec.    FINAL REVIEW [ 1 of 2, TBD ]
   ‣ 15 Dec.    FINAL REVIEW [ 2 of 2, TBD ]
   ‣ 17 Dec.    *Final* **Degree Project Proposals DUE**

3. Submission of Degree Project Proposals
   ‣ Students will submit the draft Degree Project Proposal on 23 Nov. to Section Instructors.
   ‣ Subsequently, the Degree Project Assessment Committee will review the submitted proposals.
   ‣ All feedback must be returned to students by 07 Dec. – in order for students to have sufficient time to amend their proposals by the Final Review of 14 and 15 Dec. Final Proposals are due 17 Dec.
   ‣ If a student is underperforming and at risk to receive a grade of **D** or below for the course, the student may, at the instructors' discretion, be permitted to rework the proposal for resubmission one week before the start of the Spring 2011 semester. Upon resubmission, Section Instructors and the DPAC will determine whether the student may register for the Spring 2011 semester. If, at this point, the student still fails to satisfactorily fulfill the requirements for Degree Project *Research*, the student must return the following academic year and begin Degree Project *Research* anew.

Degree Project *Research : Fall 2010*

## READING LIST

Section Instructors will assign readings in order to facilitate seminar discussions over the course of the semester. These assigned readings specifically engage the section's *Research Theme and Material practice*. Additionally, the following Reading List comprises suggested readings for particular routes of inquiry, which readily intersect with extant section topics and methodologies.

**Economies of Sustainability**

Benyus, Janine. *Biomimicry: Innovations Inspired By Nature.*

Beukers, Adriaan; van Hinte, Ed. *Lightness: The Inevitable Renaissance of Minimum Energy Structures.*

Gans, Deborah (editor). *Extreme Sites - The Greening of Brownfield.*

Mau, Bruce and the Institute without Boundaries. *Massive Change.*

McHarg, Ian. *Design with Nature.*

**New Urban Theories**

Allen, Stan."Artificial Ecologies: The Work of MVRDV", *El Croquis* 86.

Banham, Reyner. *Los Angeles: The Architecture of Four Ecologies,* "1960 - Stocktaking", "The Great Gizmo", *A Critic Writes.*

De Landa, Manuel. War in the Age of Intelligent Machines; *A Thousand Years of Nonlinear History.*

Johnson, Steven. "Street Level", *Emergence: The Connected Lives of Ants, Brains, Cities, and Software.*

Kelly, Kevin. "Hive Mind"; The Nine Laws of God", *Out of Control: The New Biology of Machines, Social Systems, and the Economic World.*

Koolhaas, Rem (editor). "The New World: 30 Spaces for the 21st Century", *Wired* 11.06, June 2003.

Kyong, Park. *Urban Ecology: Detroit and Beyond.*

Lerup, Lars. "Stim and Dross", *Assemblage* 25, December 1994.

Maas, Winy; Van Rijs, Jacob; Koek, Richard. *Farmax: Excursions on Density.*

McGrath, Brian, Weisz, Claire (editors). *New Urbanisms/New WorkPlace: Yonkers Nepperhan Valley*

Virlilio, Paul."The Overexposed City", *Lost Dimension.*

**Public Life**

Abbas, Ackbar. *Hong Kong: Culture and the Politics of Disappearance.*

Appadurai, Arjun. "Disjuncture and Difference in the Global Cultural Economy", *Global Culture: Nationalism, Globalisation and Modernity*, Mike Featherstone (editor).

Bateson, Gregory. "Ecology and Flexibility in Urban Civilization", *Steps to an Ecology of Mind.*

Jacobs, Jane. *The Death and Life of Great American Cities, The Nature of Economies.*

Katchor, Ben. *Cheap Novelties: The Pleasures of Urban Decay.*

Lambert, Greg. "Universal Hospitality", *Cities Without Citizens*, Aaron Levy, Eduardo Cadava (editors).

Pynchon, Thomas. *The Crying of Lot 49.*

Sennett, Richard. *The Conscience of the Eye: The Design and Social Life of Cities, The Fall of Public Man: On the Social Psychology of Capitalism.*

Soja, Edward. "History: Geography: Modernity", *Postmodern Geographies: The Reassertion of Space in Critical Social Theory.*

**Capital and Spectacle**

Debord, Guy. *Society of the Spectacle.*

De Certeau, Michel. "Making Do: Uses and Tactics"; "Walking in the City". *The Practice of Everday Life.*

Morse, Margaret. "The Ontology of Everyday Distraction, The Freeway, The Mall, and Television", *The Logics of Television.*

Serres, Michel. "Picaresques and Cybernetics: The New Balance", *The Parasite.*

Speaks, Michael. "After Theory", *Architectural Record*, June 2005.

Sorkin, Michael. "See You in Disneyland", *Variations on a Theme Park.*

**Alternative Practices 1960-1970**

Berman, Marshall. "Robert Moses: The Expressway World", "The 1960's: A Shout in the Street", *All That Is Solid Melts Into Air.*

Lee, Pamela. "Improper Objects of Modernity", *Object to Be Destroyed: The Work of Gordon Matta-Clark.*

Degree Project *Research : Fall 2010*

Rose, Barbara. "The Ray Gun Manufacturing Company", *Claes Oldenbug.*
Smithson, Robert. "A Tour of the Monuments of Passaic, New Jersey", "Frederick Law Olmstead and the Dialectical Landscape", *The Collected Writings.*
Vidler, Anthony. "Toward a Theory of Architectural Program", *October* 106, Fall 2003.
Wigley, Mark. "Recycling Recycling", *Interstices* 4, July 1995.

## Landscape

Deleuze and Guattari, "10,000 B.C.: The Geology of Morals (Who Does the Earth Think It Is?)"; "The Smooth and the Striated", *A Thousand Plateaus.*
Cache, Bernard."Territorial Image", *Earth Moves.*
Corner, James (editor). *Recovering Landscape: Essays in Contemporary Landscape Architecture, Taking Measures Across the American Landscape.*
Jackson, J.B. *Discovering the Vernacular Landscape, The Necessity for Ruins, and Other Topics.*
Macy, Christine and Bonnemaison, Sarah. *Architecture and Nature: Creating the American Landscape.*
Reeser, Amanda and Schafer, Ashley. *Praxis, Journal of Writing and Building*, Issue 4: Landscape.
Sante, Luc."Landscape: The Body, Home, Streets", *Low Life: Lures and Snares of Old New York.*
Steiner, Hadas."For the Birds", *Grey Room* 13.

## Practice

Archigram, *Archigram.*
Atelier van Lieshout. *A Manual.*
Diller and Scofidio. *Flesh: Architectural Probes: The Mutant Body of Architecture, Back to the Front: Tourisms of War.*
Field Operations. *Fresh Kills Landfill Project.*
Hensel, Michael, Menges, Achim, Weinstock, Michael (editors). *Emergence: Morphogenetic Design Strategies.*
Hejduk, John. "Berlin Masque", "Silent Witnesses", *Mask of Medusa.*
Herzon and DeMeuron. *Dominus Winery, Kramlich House.*
Kwinter, Sanford. "Yokohama Port Terminal", *Phylogenesis FOA's Ark: Foreign Office Architects.*
Lang, Peter and Menking, William. *Superstudio: Life Without Objects.*
Miralles, Enric; Pinos, Carme. *Igualada Cemetery, Olympic Archery Range, The Architecture of Miralles   and Pinos.*
OMA, *Master Plan for Melun Senaert, France; Hotel Convention Center, Agadir, Morocco, SMLXL.*
Salazar, Jaime. *MVRDV at VPRO; MVRDV, Dutch Pavilion World Expo 2000, Hanover.*
Sorkin, Michael. *Wiggle.*
Tschumi, Bernard. "Spaces and Events", *Architecture and Disjunction, Manhattan Transcripts.*
Woods, Lebbeus. *Anarchitecture: Architecture is a Political Act.*

Degree Project *Research* : Fall 2010

## FALL 2010 SCHEDULE

| | WEEK # | |
|---|---|---|
| **AUGUST** | | |
| 31 | 0 | Degree Project Lottery |
| | | |
| **SEPTEMBER** | | |
| 01 (Wed.) | 0 | Section Selection Forms DUE in UG Office 13:00 |
| 03 (Fri.) | 0 | Section rosters posted outside UG Office by 12:00 |
| 07 | 1 | First class meeting [ First assignment DUE ] |
| 14 | 2 | **Research and Discussions** |
| <u>21</u> | 3 | <u>Initial Research Presentations</u> |
| 28 | 4 | **Presentations and Discussions** |
| | | |
| **OCTOBER** | | |
| 05 | 5 | **Presentations and Discussions** |
| 12 | 6 | **Presentations and Discussions** |
| <u>19</u> | 7 | <u>PRE-Midterm Review</u> |
| 26 | 8 | No Class |
| | | |
| **NOVEMBER** | | |
| 02 | 9 | **MIDTERM REVIEW w/ DPAC and Outside Critics** |
| 09 | 10 | **Presentations and Discussions** |
| 16 | 11 | **Presentations and Discussions** |
| <u>23</u> | 12 | <u>*Draft* Degree Project Proposals DUE</u> |
| 30 | 13 | Last Class |
| | | |
| **DECEMBER** | | |
| 07 | 14 | Studio Reviews Week |
| 14 | 15 | **FINAL REVIEW w/ DPAC and Outside Critics [ 1 of 2 ] TBD** |
| 15 | 15 | **FINAL REVIEW w/ DPAC and Outside Critics [ 2 of 2 ] TBD** |
| <u>17</u> (Fri.) | 15 | <u>Final Degree Project Proposals DUE</u> |

In addition to presentations for the: 1) Initial Research Presentations, 2) PRE-Midterm, 3) Midterm, and 4) Final Reviews, Section Instructors may require other benchmarks to assure the timely completion of the Degree Project Proposal. These benchmarks are scheduled at the instructors' discretion.

## FINAL REVIEW SCHEDULE / LOCATIONS

As Degree Project *Research* sections keep identical schedules for all meetings, DP Instructors and Students are generally unable to follow the progress of other sections. To ensure the cross-pollination of ideas, methods, and projects among Degree Project sections, **Final Reviews** for the Fall 2010 semester will be conducted *jointly*. That is, depending on Instructors' and Students' availability, Final Reviews for each section will be held in conjunction with another section such that Instructors of both sections may together review the works of students from both sections. Accordingly, three sections will conduct reviews on 14 Dec., and three sections will conduct reviews on 15 Dec.

**NB: The joint-Review format for the Final Reviews of the Fall 2010 semester remains tentative.** The schedules and locations of the Final Reviews will be announced later in the semester.



Pratt Institute School of Architecture
Undergraduate Architecture Program
Course Syllabus

Arch 485 - Degree Project Seminar
Instructors: Ran Oron / Anthony Titus

Fall 2010

### First We Take Manhattan...Between Sebald and Guattari

In one of his final books titled *The Three Ecologies* philosopher Felix Guattari described the mental, social and environmental *instability* of the late twentieth and early twenty-first century. As a response to these precarious conditions, he put forth a theory of action in which a dynamic network of individuals and collectives would begin to structure forms of communication. These dynamic exchanges of knowledge could in turn allow us to proactively address the challenges of our time.

His definition of the *Ecological* went beyond the common idea of ecology as exclusively involving the physicality of the earth (environmental). He expanded the definition to include ideas of how we choose to communicate as both individual (mental) and collective bodies (social). Guattari's frame of reference may prove to be accurate and timely as we currently face increasing patterns of environmental, societal and ideological instability. As architects, we are the gatherers and purveyors of vast and diverse bodies of knowledge. This simple fact affords us the unique and privileged position to participate in the continued transformation of our world.

The act of destruction caused by aerial warfare will be studied as a generator for the future; how buildings and architecture can become the first line of defense against a collective amnesia. Through precise and rigorous set of explorations we intend to establish a set of principles, which transform the invention and energy found in weapons into *productive* mechanisms. These principles of human consciousness may allow us create a set of rules which attempt to develop a new social ecology, an ecology which will sustain itself.

The translation of consciousness into a built proposal, a social institution, a sustainable social institution that while being site specific and precisely weaved into an urban condition of a city also has the qualities to operate on a global level and become a part of a new environment.

The seminar will be structured as a dynamic exchange and continual development of ideas, leading towards a concrete proposal to be realized in the spring semester. The weekly sessions will consist of a set of presentations from faculty, strategically located at specific moments within the seminar to be followed by student presentations of research development. We will begin the fall semester by research into the seven cities listed below. Each of these cities has been the victim of severe aerial warfare at specific moments in history. The research will act as a point of departure in the fall semester and may lead to and will lead to an architectural proposal in the spring semester.

**Cities:**
1. Barcelona
2. Dresden / Hamburg
3. Hanoi
4. Beirut
5. Belgrade
6. Baghdad
7. Hiroshima

*Cities can be researched by individuals or in teams of 2-3 people.

**Weekly Schedule Fall 2010:**

**Week 1: September 7th 2010**
-Introduction to basic principles, requirements and expectations of the fall semester of research
-Discussion between faculty and students regarding overarching theme and topic of the seminar
-Discussion involving the specific content of the two required text
-Declaration of chosen city and research team structure to be declared by students

**Week 2: September 14th 2010**
-Presentation by faculty of theories outlined by Felix Guattari in text The *Three Ecologies*
-Discussion of content of lecture and of text

**Week 3: September 21st 2010**
**-Initial research presentations**
**-Discussion of presentations**

**Week 4: September 27th 2010**
-Continuation of research presentations
-Discussion of presentations

**Week 5: October 5th 2010**
-Presentation by faculty of theories outlined by W.G. Sebald in text On The Natural History of Destruction
-Discussion of content of lecture and of text

**Week 6: October 12th 2010**
-Continuation of research presentations
-Discussion of presentations

**Week 7: October 19th 2010**
-Pre-Midterm Review – Discussion of initial Thesis Statement and related components

**Week 8: October 26th 2010**
-No Class

**Week 9: November 2nd 2010**
**-Midterm Review w/ Degree Project Assessment Committee Member and Outside Critics**

**Week 10: November 9th 2010**
-Continuation of research presentations
-Discussion of presentations





**FROMER**
**Eye Centers**

November 3, 2010

Dr. Batool Hussaini
25-15 Steinway street
Astoria, NY 11103
Fax: 718-766-5033
Phone:  718-830-1673

RE:  Adil Khalil
MR#: 100087
DOB:  01/11/1981

Dear Dr. Hussaini:

Thank you for your kind referral of Mr. Adil Khalil to us for an ophthalmic evaluation. Mr. Khalil complains of pain, redness and nausea in the right eye for the past four weeks.

His vision on exam today is 20/200 in the right eye and 20/25 in the left.   The conjunctiva is injected.   There are 3+ white blood cells in the anterior chamber of the right eye.   The cornea is steamy.   There are granulomatous KPs diffusely covering the inferior cornea.   There are also posterior synechia in the right eye.   The left eye is normal.   On dilated exam, the left eye has a cup-to-disc ratio of 0.3 with normal vitreous floaters.   There is no view to the posterior chamber in the right eye.

To conclude, Mr. Khalil has a granulomatous uveitis in the right eye.  I started him on Pred Forte drops every hour and atropine 1% drops twice a day in the right eye.  I have referred him back to you for blood work including ACE level, Toxo IgM antibodies, chest x-ray, PPD, ANA, c-ANCA, p-ANCA testing and HLA-B27.   I will follow up with him again in one week.

Thanks again for referring this nice and interesting young man to us.   Please do not hesitate to call us with any questions.

With warm regards,

*M. Keshet*

Maayan Keshet, M.D.

MK/Zydoc/hmb

| | |
|---|---|
| From: | ran@roart.com |
| Subject: | Re: Thesis |
| Date: | Sun, November 7, 2010 2:58 pm |
| To: | akhalil@pratt.edu |
| Cc: | "Anthony Titus" <anthonytitus1@gmail.com>,ran@roart.com |

>
Hi,
I am sorry to hear about your situation and hope you will get better soon,
at this point I suggest that you concentrate your efforts on your recovery
and allow yourself the proper rest and relaxation. Please don't worry
about class or the next presentation, I think we will need all the time we
have on Tuesday for the remaining groups, we will hear you once you fully
recovered and hopefully we will be able to assist you to complete the
requirements for the semster first and the rest of the year later, health
permitting,
thank you,
Ran


professor
>
> please be aware that I have been diagnosed with iritis.
>
>
> at this time we do not know the severity of this diagnoses.
> but we do know that iritis is associated with many hereditary health
> problems.
> in if left untreated, iritis will lead to blindness.
>
> i am under constant blood testing and and doctor visits, until the eye
> specialist feels i have been cured. Unfortunately, because of the eye
> drops, sensitivity to light is a major problem, as is reading, writing and
> driving.
>
> next class, i am not sure if i am expected to present.  I am ready, please
> make me aware of my scheduled presentation date.  i was also told by ron
> that he would rather i speak to both professors instead of presenting.
> just to make both professors aware, i may need to wear sunglasses to block
> out the light. i do have a letter from the doctor explaining that i will
> be having issues with reading and driving.  In most instances iritis is a
> lifelong disease, which leads to diseases such as crones disease,
> glaucoma, leukemia, HIV, tb, graves disease, arthritis, limps, limes, and
> many many more.  at this time my doctors, and family are hoping this is
> only acute iritis, meaning that this is only a coincidence.
>
> next tuesday, at 1:30 I am expected to be in richmond hill for chest
> x-rays.  I can present you with a note from the eye specialist MD, the day
> following my eye specialist evaluation.  i can also present you with a
> letter from my pcp doctor, referring me to the radiography center for
> further investigation.
>
> as it is today, my vision has cleared up since Wednesday, which is an
> excellent sign in recovery.  In most instances, chronic iritis, even when
> treated, does not show improvement for 3-6 months.
>
>
> thank uopui
>
>



# A COMPUTERIZED PROGRESSION

ADIL KHALIL

FALL 2010

**ADIL KHALIL**

<u>SECTION INSTRUCTOR</u>: R. ORON/ A. TITUS

<u>DPAC INSTRUCTOR</u>: J. HOGREFE

<u>COURSE TITLE</u>: WEAPONS OF WAR

<u>ACADEMIC YEAR</u>: CLASS OF 2011

**A COMPUTERIZED PROGRESSION**

**Thesis Statement**

After careful analytical process of breaking down genealogy, material, program and site to be

derived at a thesis statement we begin to question technology and progression, channeling

through spaces of time.  Spaces of time meaning, at this particular moment, as the clock is in

motion, I sit here in a NYC apartment building attempting to hastily conclude my studies as I

travel through space in 2010.

We now look to Kabul, Afghanistan as the city of tomorrow.  We intend to develop a

state-of-the-art technological infrastructure, communication and transportation systems.

Progression of beautifully proportioned spaces, we intend to drive the dweller into a serious of

feelings and psychological sensations.  Rhythm, health, efficiency and technology are the key

components to a penitentiary located in the mountains of Afghanistan.

How can we progress Kabul, Afghanistan from the current time, into a timeless city

through a labyrinth of rhythmatic, mechanically perpetual series of green architectural spaces?

emissions has a fixed antenna and seeker head in the missile's nose. A smokeless, solid-

propellant, dual-thrust rocket motor propels the missile at speeds over Mach 2."

Page |2.2

[www.wikipedia.com]

The AGM-142 Have Nap was used during the Battle of Tora Bora in Afghanistan during

the War on Terror.  Tora Bora is a labyrinth of spaces in the mountains of eastern Afghanistan,

within the White Mountains region, southeast of Kabul.  Tora Bora was known to the United

States as the Taliban Regime headquarters.  During the morning of Eid al-Adha in the year of 2001,

aerial attacks commenced over the caves of the Taliban Regime.

The 'Have Nap' was an intelligent missile, launched from 50 miles away navigating

through an Al Qaeda cave, destined to seek the desired target. "The missile employs a

television seeker to deliver nearly three tons of explosives to its target. The missile was

outfitted with a warhead meant to penetrate earth and rock." [www.middleeast.org] The AGM-

142 is an Israeli developed Popeye missile. "The missile is powered by a single stage solid

rocket. An inertial guidance system pilots the missile towards the target; for terminal homing

the pilot can control the missile directly via an INS and data link, aiming via either

a television or imaging infrared seeker depending on the missile model. It is not necessary for

the launching aircraft to direct the missile - control can be passed to another platform, whilst

the firing aircraft escapes the area. There are two choices of warhead, a 340 kg (750 lb)

blast/fragmentation or 360 kg (800 lb) penetrator." [www.wikipedia.com]

Page |2.3          The technological advances of war and destruction have helped to discover the

computerized technology of movement.  Weapons that when launched, can cut through the

atmosphere and freely detect the electronic transmissions of radiation, and obliterating the foe.

Missiles designed to fly at lightning speeds, equipped with cameras to seek and exert

destructive forces upon the target.  The technology we invest into weapons of destruction, we

must begin to employ this technology into our daily lives!  Our missiles self-detect their

targets, but still we are dependent upon a mechanical key.  We must computerize our world,

to simplify our lives.

          Advanced handicapped accessibility guidelines with voice recognition, video recording,

and finger detection systems shall be common practice in all development projects.  Electric

cars, to reduce fuel emissions must be utilized. While some hover along by on a moving

walkway, still other Afghanis move along in a computerized subway cart.  Development of high

rise construction would be a mandatory in a green initiative.  Attempting to build to the sky,

we will attach each structure with structural tunnels linking architectural space and structures.

We will be designing a continuous brace throughout the fabric of the new landscape, allowing

one to explore interior and exterior spaces, alike. Ventilation and clear lighting at all times a

must in all living and working spaces. The city will operate as one continuous mesh; society

Page |2.4

operates in continuous free form of linking spaces, yet one strapping entity.  Some consider

this the place of the city, while others only refer to it as simple a thing.

## Material Practice

Material practice of this thesis shall be in content with contemporary music as it is compared to the classical era.  Through analysis, I have metaphorically compared the current state of development in the Middle East as the current state of death.  We can see through the research conducted for this thesis, a trouble Middle East.  Non-existent infrastructure, poor living conditions and uncivilized psychological state of minds seem to cohort in the Middle East.

While looking to music as a material practice for an architectural thesis, it seemed to perplex the mind.  How can we look at the sound waves of a mathematical proportioning system and translate this movement into a flow or promenade of architectural spaces?  The mind-numbing riffs of the band Grief immediately captured the mind after an initial gawk of the current state of Baghdad.

The lifestyle of the typical Middle Eastern male is conventional when compared to the average New Yorker.   New Yorkers can travel a 30 mile radius within an hour, that being a usual day. Still, the New York City transportation system seems to be crude when compared to Shanghai, China.  The proposal for a new Afghanistan must begin to think about a state-of-the art system for transportation and infrastructure.

Space of music is the rhythm of the timing.  We can't see space in contemporary music.

There is a common interval ratio, creating a monotonous trance.  We see various interval

ratios in classical music, yet still progressing in our time through the modern state of death

metal culture. For example an interval ratio such as 5/8 can be seen and executed by artists of

the classical era, and still today by the great musical acts such as Suffocation, Regurgitate or

Cannibal Corpse.

The space of music must be translated in the visual relationship and proportioning of

cities.  A sophisticated rhythm of the city fabric can be observed in parts of residential

communities throughout the United States.  An apparent rhythm while smaller in proportion is

amorphously apparent in the research of these Middle Eastern residential communities.

Although the vibrant sounds of Sergei Rachmaninoff are not provoked.

Movement of music would be defined as progression or changes of space, a continuum.

The very frequently used A-B-A-C-A-B-B form excludes contemporary music as being a

plausible source.  We will need to observe death metal as the pinnacle of musicianship of our

time.  In death metal we will observe an emphasis on an experimental movement.

Experimental, yet harshly restrained by the abortion of contemporary musical pedagogy.  The

form of death metal movement will take influence from the classical forms of music. Classical

form is non-repetitive progression of space. Classical form is intensifying almost dramatic

episode at a specific time within a particular space of the artists' piece.  No definite form can be

associated with the classical forms of music.  Although no definite form, classical form is strictly

derived through guidelines or rules.

We will need to observe the stagnant qualities and ill-nurtured abilities of the current

conditions in the Middle East.  The condition of modern day Baghdad, and or Kabul must be

symbolized and analyzed through the musicianship and wide range of techniques of modern

day iconoclast death metal.  Influenced by the precedent of the past, we must seek to create a

new form.  A simplified machine for living, seeking to intuitively create a chaotic struggle with

the past, we must modernize the Arab world!

We will need to designate the classic movement of music as SMART building.  Cities

such as Shanghai, China or Dubai, AE will need to be categorized within the bounds of SMART

building. Intent of this thesis shall be to precede the development of these SMART cities while

retaining the city fabric.

The intention of this thesis is to advocate a Middle East which will be influence by the

classical form of music, within the limitations of our current technological advances in our

current time.  The development of a stable infrastructure, sufficient electrical, water, and gas

supply and proper management of waste and storm water to the local residents and store

owners.

Page |3.4

      We must feel the progressive rhythms of our structure, while consciously being in the

space. As spaces continue, the promenade grows more intense as if stuck in the mist of

Mozart's Requiem.

**Program**

The program of this thesis, as discussed through class lecture, is expected to be a social

institution.  Through research and discovery, we have planned an advanced new free forming

musical flow of space, expressed through healthy progression of architectural spaces.  The

thesis shall be located in the place or city of Kabul, Afghanistan.

As we begin to think about programmatic requirement for a statement of such

magnitude we must first begin to realize.  The enormity of a project as large as the complete

reconfiguration or city planning of Kabul, Afghanistan is incomprehensible.  A project of such

scale would require decades of planning, possibly a lifetime of research into technology.

Development of a city is best done over long periods of time, in order to stay current with the

technological advances of the modern time.  So how can we begin to take command of Kabul?

A new penitentiary for the capture and seizure of criminals, as we begin to create a new

republic of Afghanistan.  The penitentiary shall be located within the mountains of the city, on

the outskirts.  By designing and constructing a facility to house the devious we are ensuring

the imprisonment of the Taliban regime members and other villains of the community.  The

penitentiary shall be partially embedded into a mountain.  The actual prison cells will be

required to be impenetrate.

What is the experience of the criminal?  Once a person is arrested it shall be required

by law to divide the criminals based upon gender.  Upon arrest and booking, the detainee is

Page |4.2

brought to the mountain ranges located near the city.  After entering a waiting room, you must

be transported into a second cell for health and counseling.  After clearance is granted for

health and counseling, prisoners are then transported to a holding cell, where they are being

prepared to be jailed in a cell with thirty others.  Patiently waiting to see the judge, the captive

will be evaluated for dismissal or residence.  Upon Residence convicts are taken to a large

holding cell.  Awaiting a new sleeping unit, prisons are designed so as to hold up to two

inmates in one cell.

A jail is often home to many people.  We must acknowledge that the design for a prison

will require the minimum needs a human being requires in order to live a healthy life, awaiting

his/her rehabilitation and reentrance into society.

Other programmatic issues may require a healthy staff entranceway. Access for

criminals, visitors and employees will be required.  Restricted and public accessed spaces linked

to service and serviced spaces must be distinguished.  Mechanical and Electrical requirements·

must be satisfied for the health of all occupants.  Structure, the ability to hold the material

weight of the building shall be naked to the eye, as the rhythm is free.  The semiology of a

rhythm is synonymous with music, and reminding one of a tranquil feeling, mandatory to be

repetitive and in the classical sense related by proportioning.  Architecture, which is the

Page |4.3

aggregation of spaces, and as the thesis will require a progressive rhythm of state of the art,

ease of use, and almost self-operating space.

The design of a jail will need to be researched through precedent studies.  Jails such as

Alcatraz Island, Old Melbourne Gaol, Kilmainham Gaol, Eastern State Penetentiary, Robben

Island, and Guantánamo Bay must be analyzed.  The design and construction of concentration

camps and similar facilities must also be research and understood. Field trips to local jail, such

as Riker's Island or Riverhead Correctional Facility, should be considered, helping to

understand the complexity of the programmatic problem.  In order to comprehend the security

and programmatic requirements of penitentiary and similar facilities we must first concentrate

our abilities on the research of the past successes and failures.

As research is conducted and the problem of the need for a detention center facility in

the Middle East can be better understood, the programmatic issues will come to light and

better understood.  Extensive research on both architectural precedents of the past and

technological advances is mandatory, in order to aid in the creation of a new healthy, secure,

impenetrable flow of architectural spaces.

**Site**

The site for this thesis must be in the heart of the Taliban Regime.  Since a 1996 conquest of

Kabul, Afghanistan, the Taliban regime has been in control.  At this time, Kabul is the most

bewildering city on planet earth, with an estimated population of 2.8 million, making Kabul the

densest of the fourteen Afghani cities.  Within the 2.8 million individuals that occupy Kabul, the

Taliban army is growing anonymously amongst the civilians.  Suicide bombing and similar

terrorist activity is not uncommon within the community, putting children, women and the

elder within the callous path of evil.  The intent of this thesis shall be to create a safe and

secure Afghanistan.  By shrewdly rebuilding the social health conditions of Kabul, we can

gradually eliminate the power of the Taliban.

Kabul, Afghanistan is located in an extremely historic place on this planet earth,

considered to be associated with holy lands.  Muslim historians believe the name "Kaaba," the

holiest mosque on planet earth built by Abram, and Muhammad ibn 'Abdullāh, refers to the

Kabul River.  The land was known to have affiliation with the Mogul empire and Delhi of

Sultanate.  The location is strategic, surrounded by rough mountainous terrain on all sides;

Kabul sits 5,900 feet above sea level.  Kabul is placed at the center of many historic trade

routes between Indus River valley civilizations' and the Middle East.

Kabul climate is mostly warm, raining in the winter while rarely turning to snow.   All year long the weather in Kabul seems to be mildly warm or mildly cool.   Temperatures in the summer range from 55-85 degrees Fahrenheit, while winters range from 25-40 degrees Fahrenheit.

Page |5.2

Since the 1980's Afghanistan has been located in an almost abandoned state. Informally the land was occupied by the Red Army after the Russian defeat of the Mujahedeen rebels.  During the Cold War, Kabul was a major American base.  The caves of Tora Bora where originally designed by the American government as a command center over the Soviet Union.  Currently the land is known to be ruled by the Taliban Regime.

## Bibliography

http://www.middleeast.org/print.cgi?category=Magazine&year=2001&month=12&num=499

http://www.fas.org/man/dod-101/sys/smart/agm-142.htm

http://en.wikipedia.org/wiki/Iraq_War

http://en.wikipedia.org/wiki/AGM-142_Have_Nap

http://en.wikipedia.org/wiki/AGM-88_HARM

http://en.wikipedia.org/wiki/Kabba

http://en.wikipedia.org/wiki/Muhammad

http://en.wikipedia.org/wiki/Jesus_christ

http://en.wikipedia.org/wiki/Abraham

http://www.gotravel24.com/theme/feature-focus/worlds-most-famous-jails

Moynihan, Michael; Soderlind, Didrik. Lords of Chaos. Los Angeles, CA: Feral House, 1998.

Page |6.1



200 Willoughby Avenue
Brooklyn, NY 11205
Office of the Vice President for
Student Affairs

December 21, 2010


Adil Khalil
akhalil@pratt.edu

Dear Adil:

Thank you for meeting with Katie Hale and me today. We met with you because of several reports that we received from faculty, staff and students from the School of Architecture that they were concerned about your behavior in class. They expressed concern about your ability to meet your responsibilities as a student and the potential for disruption of the normal operations of the classroom. In particular they were concerned about the following behaviors:

1. Erratic, confused, aggressive and sometimes incoherent behavior at your thesis presentation on 12/14/10. The contents of the presentation were graphic and violent so that the concern about the manner in which you presented was exacerbated. In fact, several people reported being fearful of you.

   During our discussion you admitted to being confused and erratic during your presentation. Further, you indicated that you were very angry and upset with your instructors and you are aware that your anger likely influenced the way that you behaved. You apologized for being inappropriate.

2. The students and the instructors also indicated that your behavior in previous classes was also sometimes disruptive for you and in some cases for others. In several cases you were unable to sit still during class and you got up and left class.

   You acknowledged that this has happened although you were not certain of the frequency.

3. Repeated absences and lateness to class

   You admitted to being late and missing class due to your sarcoidosis. You also indicated that the absences were excused and that you were told that they would not affect your grade.

We also discussed possible causes of your disruptive behavior that included the possibility of a reaction to your steroid medication, your anger and frustration and possibly a mental health condition.

Because of these concerns with your behavior, I have decided to administratively withdraw you from Pratt Institute until you present me with evidence that you have

control of your behavior and that you will not be disruptive in class and that you are healthy enough to attend class and be on time.

As discussed, you could accomplish this by taking the following steps:

1.  Send a letter to Martha Cedarholm, the Director of Health and Counseling from the physician who is treating you for sarcoidosis indicating that your erratic, aggressive and incoherent behavior could have resulted from your sarcoidosis medication (steroids) and that you are no longer taking the medication. Further the letter should indicate that you are well enough to be able to attend class regularly, and be on time. Martha will make a recommendation to me based on the letter.
2.  Meet with Dr. Reder to receive a referral for a counselor to see off campus in order to gain additional insight into your behavior*.
3.  Explore the possibility during your counseling sessions that your inappropriate and unproductive behavior is a result of a mental condition and whether or not psychological treatment could assist you in changing your behavior.
4.  If you decide that psychological treatment will be helpful, continue in treatment and submit documentation to Vince Kiefner, Associate Director of Health and Counseling that you are well enough to behave appropriately. Dr. Kiefner will make a recommendation to me and I will decide if you are ready to return to class.

Please note that you will not be able to continue counseling sessions with Dr. Reder when you are not enrolled in Pratt Institute and she will be not be on-campus during the semester break. As a result, I have changed my recommendation for you to be referred by her to an off-campus provider. Health and Counseling will help you with your health insurance. She will be on campus through December 23rd so she can meet with you about a referral sometime over the next two days. Please contact the Health and Counseling Office to schedule an appointment.

I appreciate your willingness to listen and to take the steps necessary so that you can behave appropriately in class. Until you are approved to return, you are not to have contact with anyone at Pratt Institute except for me, my Assistant, Dr. Reder and the staff in the Health and Counseling Service.

I hope that you are able to resolve these challenges and return to Pratt so that you can graduate and continue with your career.

Sincerely,

Helen Matusow-Ayres, Ed.D.

CC:  Erika Hinrichs, School of Architecture
Ariela Reder, Health and Counseling
Martha Cedarholm, Health and Counseling
Katie Hale, Student Conduct
Vince Kiefner, Health and Counseling



Printer Friendly

From:      "hmayres" <hmayres@pratt.edu>
Subject:   Re: Administrative Withdrawal
Date:      Thu, February 3, 2011 12:21 pm
To:        akhalil@pratt.edu
Cc:        "Vince Kiefner" <vkiefner@pratt.edu>,"Martha Cedarholm" <mcedarho@pratt.edu>

Adil:

In summary Dr. Hershberger indicated that in his opinion he does not believe that you present a risk to the physical safety of professors or students at Pratt. However, he did indicate that he believes that without ongoing and continuous mental health treatment and observation you pose a significant **risk of disruption to the learning of others** at Pratt . Factors that contribute to this risk include:

1. A limited ability to accept critical feedback regarding your work
2. Undervaluing the work, skill and authority of others
3. Extreme challenges in working with others and very limited insight regarding the causes of this problem
4. Past behavior that confused and frightened fellow students and teachers

There is a high probability of recurrence of the behavior that led to your administrative withdrawal without a successful, sustained engagement in mental health treatment. Therefore, a return to school is not recommended at this time.

This report confirms Pratt's experience with you in the classroom environment. I therefore would not recommend that you continue taking classes anywhere until you have resolved these challenges. Please let me know when you find a therapist and I will have Dr. Hershberger's report forwarded to that individual. You are also welcome to return to Dr. Hershberger for treatment.

On Feb 1, 2011, at 2:56 PM, akhalil@pratt.edu wrote:

> Dean Ayres:
>
> My family is very concerned about my mental health situation. Can you
> please forward me the report from the psychiatrist so i can share this
> with my family.
>
> Thanks
> adil.

>> Adil:
>>
>> I will check with the School of Architecture on Monday to see if this is
>>
>> possible.
>>
>>
>> On Jan 28, 2011, at 1:19 PM, aknalii@pratt.edu wrote:
>>
>>> Dean Ayres
>>>
>>> I am also asking for special permission to take both professional
>>> practice
>>> and cultural history at another university, so these can be transfered
>>> over to pratt.





### UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS
32 OLD SLIP, 26TH FLOOR
NEW YORK, NEW YORK 10005

TIMOTHY C. J. BLANCHARD
DIRECTOR
NEW YORK OFFICE

March 17, 2011

Ms. Adil Khalil
158 Broadway
Shirley, New York 11967

Re:     Case No. 02-11-2083
        The Pratt Institute

Dear Ms. Khalil:

On March 17, 2011, the U. S. Department of Education, New York Office for Civil Rights (OCR) received your correspondence(s). It has been assigned case number 02-11-2083.

Please read the enclosed document entitled "OCR Complaint Processing Procedures." Additional information about OCR and the laws we enforce are available on our website at http://www.ed.gov/ocr.

We have also enclosed a Consent Form. Please sign and date this Consent Form and return it to us as soon as possible. If we do not receive the signed Consent Form within 20 calendar days of the date of this letter, OCR may close your complaint.

OCR is committed to providing prompt and effective service. If you need to communicate with OCR regarding your complaint before you are contacted directly, please contact the office at (646) 428-3800, by fax at 646-428-3843 or by email at OCR.NewYork@ed.gov.

Very truly yours,

Diane S. Diggs

Encl.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by*



## john matheus

**From:** hmayres <hmayres@pratt.edu>
**Sent:** Monday, May 09, 2011 10:32 AM
**To:** jmatheus@pratt.edu
**Subject:** Re: Adil Khalil: ACADEMIC RECORDS

John:

You can meet with him, but I would suggest that you have another person present. It is important that we respond to him in the same way that we respond to any other student. If you want more information, you can call me or we can meet. I told him that you were likely to be tied up until after graduation.

On May 6, 2011, at 1:38 PM, john matheus wrote:

Hello Helen,

Please advise.

Regards,
    John M. Matheus
John M. Matheus
Associate Registrar
Pratt
Pratt Institute
6th Floor, Myrtle Hall
200 Willoughby Avenue
Brooklyn, NY 11205
jmatheus@pratt.edu
718-636-3548 fx
718-636-3664 ph

ATTENTION STUDENTS & FACULTY:  Be sure to use and check your Pratt email account! Your Pratt email is the official form of communication for the Institute.

-----Original Message-----
From: akhalil@pratt.edu [mailto:akhalil@pratt.edu]
Sent: Friday, May 06, 2011 12:45 PM
To: jmatheus@pratt.edu
Subject: Re: Adil Khalil: ACADEMIC RECORDS

Please provide me with withdrawal date from design class in the spring 2008 semester.  Thank you

1



**JEAN J. YANG, M.D.**
OPHTHALMOLOGY AND OPHTHALMIC SURGERY
UVEITIS AND OCULAR IMMUNOLOGY
153B JERICHO TPKE
MINEOLA, NY 11501

Telephone (516) 873-0200   Fax (516) 873-0243

September 27, 2011

Re: Khalil, Adil

To Whom It May Concern:

Mr. Khalil has had uveitis since October 2010   He has been treated for this condition with immunosuppressive treatment, which includes Methotrexate and Neoral, since July this year.  The treatment plan is continue the current treatment for approximately 2 years.

Sincerely,

Jean Yang, MD



# Add Comment



**Detective Banks**
Submitted: 04/13/2013

Good afternoon Sir, you have been reported for making false allegations against Natalie B along with dozens of other complaints of explicit content and harrasment towards Natalie friends and family members.

Please contact me directly @ NYPD **(212) 477-7411**
so we can discuss this promptly.

Thank you for your cooperation in the matter.
Detective Banks
NYPD - Criminal Investigation Department

# Add Comment















# Prehospital Care Report Summary

## FDNY

**Date:**02/07/2014  **Call #:**3870  **Booklet:**80620647  **Branch:** 50   **Time Zone:**America/New_York

### Call Information:

| | | | |
|---|---|---|---|
| **Disposition:** | Treated/Transported | **# Patients Transported** | |
| **Unit #:** | 50H3 - 50H Tour 3: 1600-2400,  Ambulance - Land   **Trip Type:** N/A | In My Unit: | 1 |
| **Run Type to Scene:** | Emergency | **# Patients at Scene:** | N/A |

**Incident Facility:**

| | | | |
|---|---|---|---|
| **Incident Location:** | 87-27 169 ST - Queens, NY 11432-3642 (Queens County) | **Call Received:** | 22:29:43 |
| **Incident Type:** | Residence (Home) | **Dispatched:** | 22:30:06 |
| | | **En Route:** | 22:30:14 |
| **Receiving Facility:** | 38 - Queens Hosp. Center (Hospital) - 82-68 164 Street - Jamaica, NY 11432 | **On Scene:** | 22:34:42 |
| **Facility Address:** | 82-68 164 Street #Q - Jamaica, NY 11432 | **Patient Contact:** | 23:50:00 |
| **Destination Type:** | N/A | **Left Scene:** | 00:01:39 |
| **Dest. Reason:** | Nearest Facility | **At Destination:** | 00:08:18 |
| **Registration #** | N/A | **Transfer of Care:** | N/A |
| | | **In Service:** | N/A |

| | | | |
|---|---|---|---|
| **Loaded Mileage:** | 0.8 (Total Mileage: 0.8) | | |
| **Crew Members:** | Brian Saks, EMT Basic*(DS)(DH)*; Alex Vallejo, EMT Basic*(DOC)* | **Time On Scene:** | 87 Min |
| | | **Time to Destination:** | 98 Min |
| **Moved to Amb By:** | Walked with Assist  **Transport Position:** Sitting   **From Amb By:** | **Total Time of Run:** | N/A Min |

**Other Units On Scene:** C531

**Call Origin:**  N/A     **Lights/Siren:**  Scene  / Destination-Not used

### Patient Information:

| | | | |
|---|---|---|---|
| **Name:** | ADIL KHALIL | **DOB:** | 01/11/1981 |
| **Address:** | 87-27 169 ST - Queens, NY 11432-3642 | **Gender:** | Male |
| **Phone:** | | **Age:** | 33 Years |
| **Email:** | | **Weight:** | Broselow |
| **SSN:** | -- | | |
| **Driver License:** | | | |

| | | | |
|---|---|---|---|
| **Current Meds:** | None | **Comments:** | |
| **Env Allergies:** | NKA | **Comments:** | |
| **Med Allergies:** | NKDA | **Comments:** | |
| **Patient Physician:** | | | |
| **Advanced Directives:** | | | |
| **PMH:** | None | | |
| **Comment:** | | | |

### Payer Information:

**Priority:** Primary   **Name:** Self Pay                           **Type:**            **Policy #:**                  **Group #:**
**Policy Holder :**  ,  , Apt                                                                          **Phone:**                  **DOB:**

### Clinical:

**Onset Date/Time:** 02/07/14  22:19:00                                    **Medical Need:**
**Dispatch Reason (EMD):**  UNC   UNC - Unconscious Patient

**Chief Complaint:** i drank whiskey
**Provider Impression:** No Medical Problem
**Mechanism of Injury:** Alcohol Intox
**Protocol 1:**                                    **Protocol 2:**

I CERTIFY THAT THIS IS A TRUE COPY OF AN
ORIGINAL FIRE DEPT. RECORD, KEPT IN THE
NORMAL COURSE OF BUSINESS.

SIGN: _____

### Assessments:

| Time | Employee | Type | Summary |
|---|---|---|---|

| | **ABC** | **Breathing:** Normal **Quality:** Unlabored **Lung Sounds: Left:** Clear **Lung Sounds: Right:** Clear |
| | | **Skin Color:** Normal **Skin Temperature:** Normal **Skin Condition:** Normal |
| | **Head To Toe** | **Head and Neck:** |
| | | **Left Eye:** Reactive |
| | | **Right Eye:** Reactive |
| | | **Abdomen and Pelvis** |
| | | **LUQ Abdomen:** Normal |
| | | **RUQ Abdomen:** Normal |
| | | **LLQ Abdomen:** Normal |
| | | **RLQ Abdomen:** Normal |
| | **Neurological** | **AVPU:** Alert |

## Vitals:

| Time | Employee | Summary |
|---|---|---|
| | | **Glasgow Coma Score:** E (4) + V (5) + M (6) = 15 |
| 23:53:00 | Vallejo, Alex | **BP:** 140/ 100 |
| | | **Pulse:** 124 |
| | | **Resp:** 16 |
| | | **Pain:** 0 |
| 00:03:00 | Vallejo, Alex | **BP:** 140/ 94 |
| | | **Pulse:** 120 |
| | | **Resp:** 16 |
| | | **Pain:** 0 |

## Treatments/Medications:

| Time | Employee | Summary |
|---|---|---|
| 23:50:00 | Vallejo, Alex | **Treatment- 1 - BLS Assessment** |
| | | **Attempts:** N/A **Success:** Yes |
| | | **Level:** BLS |

## Supply

| Qty | Supply |
|---|---|

## FlexFields:

| FlexField | Value |
|---|---|
| Flow Chart: Med Code [1] - Medication Complication | Not Applicable |

## Narrative History Text:

33 YR OLD MALE FD. AMBULATING ON SCENE. PD ON SCENE. UPON ARRIVAL OF EMS, C531 AN REQUESTED.  ESU REQUESTED BY PD, PD CAPTAIN ARRIVED ON SCENE.  AFTER PROLONGED WAIT WITH PD, ESU AND C531 PT ARRIVED ON SCENE ETOH.  PT WAS RESTRAINED BY PD AND TAKEN TO AMBULANCE. PE REVEALS= NEG LOC, NEG DIZZINESS, PEARL, PATENT AIRWAY, NEG SOB, +PULSE MOTOR SENSORY X 4 EXT.  PT DENIED TRAUMA/MED PROBLEMS, NONE NOTED.  PT TX HOSP 38 UNDER PD RESTRAINT WITH PD PCT 107 # 2103 ONBOARD WITHOUT FURTHER COMPLICATIONS.

## Unable to Sign:
**Unable to Sign Reason:** Physically Incapable
**Authorized Representative:** No authorized representative is available or willing
**Authorized Representative Signature:** No
**Secondary Documentation:** Unable to obtain secondary documentation
**Secondary Documentation Signature:** No
**Comment:**

**Auth Signature:** No    **Privacy Sig:** No    **Unable to Sign:** Yes    **Refused to Sign:** No

## Signature Image(s):

Authorization Signature

Privacy Notice Signature

Receiving RN / MD Signature - mercado - 02/08/2014 00:21

Technician Signature - Vallejo, Alex - 02/08/2014 00:02



# Prehospital Care Report Summary

## FDNY

**Date:** 02/08/2014  **Call #:** 1117  **Booklet:** 80621280  **Branch:** 50  **Time Zone:** America/New_York

## Call Information:

| | | | |
|---|---|---|---|
| | | **# Patients Transported** | |
| **Disposition:** | No Transport/Refused Care | **In My Unit:** | 0 |
| **Unit #:** | 50D2 - 50D Tour 2: 0800-1600, Ambulance - Land   **Trip Type:** N/A | **# Patients at Scene:** | 1 |
| **Run Type to Scene:** | Emergency | | |
| **Incident Facility:** | | **Call Received:** | 09:14:57 |
| **Incident Location:** | 87-27 169 ST ##3A - Queens, NY 11432-3642 (Queens County) | **Dispatched:** | 09:15:39 |
| **Incident Type:** | Residence (Home) | **En Route:** | 09:15:45 |
| | | **On Scene:** | 09:21:00 |
| **Receiving Facility:** | N/A - | **Patient Contact:** | 09:23:00 |
| **Facility Address:** | | **Left Scene:** | N/A |
| **Destination Type:** | N/A | **At Destination:** | N/A |
| **Dest. Reason:** | N/A | **Transfer of Care:** | N/A |
| **Registration #** | N/A | **In Service:** | 10:04:00 |

**Loaded Mileage:** 1.0 (Total Mileage: 1.0)
**Crew Members:** Alexander Horn, EMT Basic*(DS)*; Robert Skarda, EMT Basic*(DOC)*

**Moved to Amb By:**   **Transport Position:**   **From Amb By:**

**Time On Scene:** N/A Min
**Time to Destination:** N/A Min
**Total Time of Run:** 48 Min

**Call Origin:** N/A   **Lights/Siren:** Scene-Not used  / Destination-Not used

## Patient Information:

**Name:** ADIL KHALAL
**Address:** 87-27 169 ST ##3A - Queens, NY 11432-3642
**Phone:** (516) 652-4626
**Email:**
**SSN:** --
**Driver License:**

**DOB:** 01/11/1981
**Gender:** Male
**Age:** 33 Years
**Weight:** Broselow:

**Current Meds:**       **Comments:**
**Env Allergies:**      **Comments:**
**Med Allergies:**      **Comments:**
**Patient Physician:**
**Advanced Directives:**
**PMH:**
**Comment:**

## Payer Information:

## Clinical:       Medical Need:

**Onset Date/Time:**
**Dispatch Reason (EMD):** INJURY   INJURY - Non-Critical Injury

**Chief Complaint:** "i was beaten by the cops last night."
**Provider Impression:**
**Mechanism of Injury:**
**Protocol 1:**              **Protocol 2:**

I CERTIFY THAT THIS IS A TRUE COPY OF A ORIGINAL FIRE DEPT. RECORD, KEPT IN TH NORMAL COURSE OF BUSINESS.

SIGN: _____

## Assessments:

| Time | Employee | Type | Summary |
|---|---|---|---|
| | | | |

## Vitals:

| Time | Employee | Summary |
|---|---|---|
| | | |

## Treatments/Medications:

| Time | Employee | Summary |
|------|----------|---------|

## Supply

**Qty Supply**

## Narrative History Text:

33 Y/O MALE FOUND AT DOORWAY OF APARTMENT STANDING UPRIGHT. PT STATES "I WAS BEATEN BY THE COPS LAST NIGHT." C/O OF BEING HIT IN HIS RIGHT EYE. PT WAS HESITANT TO LET CREW IN STATING "I DONT WANT COPS HERE." PT WAS FULLY AMBULATORY IN APARTMENT RT EYE SHOWS -BRUISING/SWELLING/BLEEDING. PT KEPT REPEATING "ITS ILLEGAL TO DRINK FIVE
BEERS, THE COPS BEAT YOU UP." PT WANTED TO SEE HIS PRIVATE MD & WOULD NOT ALLOW CREW TO
DO AN ASSESSMENT. PT WAS AGITATED & REFUSED CARE AND TXP INSISTING HE WOULD ONLY SEE HIS PRIVATE MD. PT SIGNED A REFUSAL FOR ALL WITNESSED BY CREW.

**Auth Signature:** Yes **Privacy Sig:** Yes **Unable to Sign:** No **Refused to Sign:** No

## Signature Image(s):

**Authorization Signature - ADIL KHALAL - 02/08/2014 09:28**
PATIENT INFORMATION DISCLOSURE AND ASSIGNMENT OF CLAIM: I acknowledge that I have been given the Notice of Privacy Practices and Patient Information Release/Assignment of Claim, set forth on the Patient Copy of this Prehospital Care Report and have read or been informed of their contents, including the purposes for which my protected health care information will be shared, and my responsibility for any charges for services not covered by my insurance or found to be medically unnecessary. I hereby authorize, for myself or my dependent(s), the release of medical and other information for the purposes specified, including treatment and billing. I further authorize and assign payment of Medicare and any other authorized benefits to the NYC Fire Department.

**Privacy Notice Signature - ADIL KHALAL - 02/08/2014 09:28**
PATIENT INFORMATION DISCLOSURE AND ASSIGNMENT OF CLAIM: I acknowledge that I have been given the Notice of Privacy Practices and Patient Information Release/Assignment of Claim, set forth on the Patient Copy of this Prehospital Care Report and have read or been informed of their contents, including the purposes for which my protected health care information will be shared, and my responsibility for any charges for services not covered by my insurance or found to be medically unnecessary. I hereby authorize, for myself or my dependent(s), the release of medical and other information for the purposes specified, including treatment and billing. I further authorize and assign payment of Medicare and any other authorized benefits to the NYC Fire Department.

Receiving RN / MD Signature

Technician Signature - Skarda, Robert - 02/08/2014 10:03

**I Refuse Treatment/Transportation Signature - ADIL KHALAL - 02/08/2014 09:28**
RELEASE/REFUSAL OF MEDICAL ASSISTANCE (RMA): I have been advised and I understand that I require medical assistance, and will be transported to a hospital of my choice, and that my refusal to accept such medical assistance may imperil my health or result in death, but I nonetheless refuse to accept the medical assistance. I agree to assume all risks, consequences and costs of my decision not to accept such care, and I release the provider of ambulance service, and its employees, agents and independent contractors, from any liability arising from my decision.

Witness Signature for Refusal - ALEXANDER HORN - 02/08/2014 10:03





**POLICE DEPARTMENT**
**LEGAL BUREAU**
F.O.I.L. UNIT, ROOM 110C
ONE POLICE PLAZA
NEW YORK, NY 10038

April 8, 2014

Khalil Adil
158 Broadway
Shirley, NY 11967



File #2014-PL-2618
Your File #

Dear Sir or Madam:

This is in response to your letter dated, 03/22/2014 in which you request access to certain records under the New York State Freedom of Information Law ("FOIL").

In regard to your request for 911 calls, I must deny access to these records on the basis of Public Officers Law Section 87(2)(b), as such records/information if disclosed would constitute an unwarranted invasion of personal privacy.

Regarding your request for any police related documents that you are entitled to such as aided reports, complaint reports, etc. , this unit is unable to locate such records responsive to your request based on the information provided.

In total, 6 pages have been copied and are enclosed.

**APPEAL PROCEDURE**

You may appeal this decision or any portion thereof in writing, within thirty (30) days of the date of this letter, and forward it to:

**Jonathan David**
Records Access Appeals Officer, N.Y.C.P.D, One Police Plaza-Room 1406, NYC 10038-1497

Sincerely,

Richard Mantellino
Lieutenant
Records Access Officer

COURTESY • PROFESSIONALISM • RESPECT



**POLICE DEPARTMENT**
**LEGAL BUREAU**
F.O.I.L. UNIT, ROOM 110C
ONE POLICE PLAZA
NEW YORK, NY 10038

Khalil Adil                                                July 9, 2014
158 Broadway                                           2014-PL-2618
Shirley, NY 11967

Dear Sir or Madam:

    This is in further response to your letter dated 03/22/14, in which you request access to certain records under the New York State Freedom of Information Law ("FOIL").

    In regard to the document(s) which you requested, a determination letter was sent to you on April 8, 2014, that provided an explanation of the action taken by the FOIL Unit. A certified copy of that letter is enclosed. However, the original determination letter contained a sentence that stated, "In total, 6 pages have been copied and are enclosed." That sentence was included in the determination letter in error and should be disregarded. The remaining content of the determination letter stands as final determination made by the FOIL Unit. If you have any questions please contact the FOIL Unit at (646) 610-6445.

                                                            Sincerely,

                                                            Richard Mantellino
                                                            Lieutenant
                                                            Records Access Officer